# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1952

_____

United States of America,                    *
                                             *
            Appellant,                        *
                                             *
      v.                                      *
                                             *
William Irwin Davis, Jr.,                     *
                                             *
            Appellee.                         *
-----------------------------------          *
                                             *
United States of America,                     *
                                             *
            Appellant,                        *
                                             *
      v.                                      *  Appeal from the United States
                                             *  District Court for the
Kevin Paul Moyer,                             *  Southern District of Iowa
                                             *
            Appellee.                         *
------------------------------------         *
                                             *
United States of America,                     *
                                             *
            Appellant,                        *
                                             *
      v.                                      *
                                             *
William John Irvin, Jr.,                      *
                                             *
            Appellee.                         *

_____

Submitted: June 13, 2000

Filed: March 29, 2001
_____

Before WOLLMAN, Chief Judge, McMILLIAN, Circuit Judge, and PANNER,[1]
     Senior District Judge.

_____

McMILLIAN, Circuit Judge.

The United States (the government) appeals from an order entered in the District Court[2] for the Southern District of Iowa granting defendants' motion to exclude certain DNA evidence as a discovery sanction against the government. For reversal, the government argues that the district court abused its discretion in excluding this DNA evidence. For the reasons discussed below, we affirm the order of the district court.

The district court had original subject matter jurisdiction over this criminal matter pursuant to 18 U.S.C. § 3231. We have jurisdiction over this interlocutory appeal by the government pursuant to 18 U.S.C. § 3731. See United States v. Mavrokordatos, 933 F.2d 843, 846 (10th Cir. 1991) (holding order excluding evidence as a discovery sanction was an appealable order pursuant to 18 U.S.C. § 3731). The government filed a timely notice of appeal pursuant to Fed. R. App. P. 4(b)(1)(B).

_____

[1]The Honorable Owen M. Panner, Senior United States District Judge for the District of Oregon, sitting by designation.

[2]The Honorable Ronald A. Longstaff, Chief Judge, United States District Court for the Southern District of Iowa.

According to the government's theory of the case, on January 7, 2000, at about 8:30 a.m., William Irwin Davis, Jr., and Kevin Paul Moyer, who were armed and wearing masks like those worn in the movie "Scream," entered the employee entrance of the Bank of America located on S.E. Army Post Road in Des Moines, Iowa. Davis directed a bank employee and another individual into the bank vault and told the bank employee to fill a bag with money. Moyer kept two other bank employees in the main lobby. The robbers obtained about $115,600.00 and then locked the bank employees and the other individual in the basement. They then attempted to leave but found themselves locked inside the bank. William John Irvin, Jr., who had been waiting outside in a 1996 maroon Chevy Blazer, drove the Blazer through the glass front door of the bank to enable Davis and Moyer to escape. They fled in the Blazer and were chased by several police cars. The Blazer was later found abandoned on the southside of Des Moines. The police apprehended them later that day on the southside of Des Moines.

Davis, Moyer and Irvin (hereinafter referred to collectively as defendants) were initially charged in state court with robbery in the first degree. On February 15, 2000, a federal grand jury indicted defendants, charging them with conspiracy to commit armed bank robbery, in violation of 18 U.S.C. § 371, armed bank robbery, in violation of 18 U.S.C. § 2113(a), (d), use of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c), and unlawful possession of a firearm, in violation of 18 U.S.C. § 922(g). On February 18, 2000, defendants made their initial appearance before a magistrate judge; the government was required to produce Fed. R. Crim. P. 16 discovery materials by February 28, 2000. Defendants were ordered detained pending trial, and the case was scheduled for trial during the criminal trial period beginning April 3, 2000.

On March 24, 2000, FBI special agent Jeff Atwood contacted Paul J. Bush, a criminalist with the Iowa Division of Criminal Investigation, State Crime Laboratory, and requested him to expedite the DNA testing because the trial was scheduled to begin

on April 3. The lab had received DNA samples from defendants, two stocking caps and two "Scream" masks on February 4, 2000. Bush expedited the DNA testing, orally reported the preliminary results to the government on March 30, 2000, and submitted his written report on March 31, 2000. The results of the DNA testing were that one "Scream" mask matched Moyer, the other "Scream" mask matched Davis, the gray stocking cap matched Irvin, and the black stocking cap matched both Irvin and Davis.

On March 27, 2000, the magistrate judge held a hearing on Moyer's motion for discovery about three other bank robberies that the government believed had been committed by defendants. In addition, Irvin had written a letter to the court about proceeding pro se. The magistrate judge did not rule on Irvin's motion for leave to proceed pro se but did appoint counsel to advise him on the issue. The case was assigned to Chief Judge Longstaff for trial on April 3, 2000. The government did not mention its request to expedite the DNA testing.

On March 30, 2000, the district court considered Irvin's motion for leave to proceed pro se. After making a full record on the motion, including the possibility that Irvin's trial might be severed from his co-defendants if he were to proceed pro se, the district court granted Irvin's motion for leave to proceed pro se and appointed his attorney as "stand by" counsel. Moyer and Davis then requested a severance on the ground that they would be prejudiced by going to trial with a pro se co-defendant and the complication of DNA evidence. The government opposed the motion for severance. The district court then inquired about the DNA evidence. The government stated that a written report would be completed the next day (March 31) and that it had already orally informed defense counsel of the preliminary results just before the hearing. The district court requested the government to make the written report available to defense counsel as soon as it had been received. Counsel for Moyer then stated that Moyer would move to exclude the DNA evidence as untimely. Counsel for Moyer and Davis indicated that they would not seek a continuance. The district court then stated that a hearing on the DNA evidence would be held the next day at 1:30 p.m.

-4-

The district court then granted Irvin's motion for leave to proceed pro se and Davis's and Moyer's motions for severance and set Davis's and Moyer's trial for April 3, 2000, noting that Irvin's trial would be rescheduled for a later date.

On March 31, 2000, at about 1:00 p.m., the government faxed the written DNA evidence report to defense counsel and the district court. Moyer filed a motion to suppress on the ground that there was no probable cause for the hair and saliva samples used in the DNA testing. Counsel for Davis and Moyer orally moved to exclude the DNA evidence as untimely and rejected any continuance of the April 3 trial date.

At the hearing, Bush testified about the results of the DNA testing and about the testing procedures at the state crime lab. According to the lab procedures, items like the bank robbery evidence which had been received during February were assigned on March 1 to a particular analyst, in this case, to him. Items are tested on a first-come, first-served basis unless there is a request for expedited testing. Bush testified that on March 24 the FBI requested that he expedite the DNA testing on the bank robbery evidence because trial was scheduled to begin on April 3 and that he had not known about the trial date. Bush began testing the bank robbery items on March 27 and, with the assistance of other staff members, completed the testing, communicated the preliminary results to the government on March 30, and submitted his written report on March 31 at about 12:20 p.m. Bush had not begun testing earlier because of the backlog of cases at the lab. He testified that the DNA testing performed in this case would ordinarily take about four days and that, if he had been requested to do so by February 24, he could have completed the testing by February 28. The government did not explain why it did not request expedited testing until March 24.

Bush also testified that DNA extracted from the "Scream" masks and stocking caps could be used for additional DNA testing, the Polymerase Chain Reaction (PCR) test was used to compare the extracted DNA and defendants' samples, PCR is the

DNA test of choice in forensic testing, and there should be enough extracted DNA to perform additional PCR tests.

The district court granted defendants' motion to exclude the DNA evidence. The district court acknowledged that the DNA evidence was "very convincing" that defendants robbed the bank as charged in the indictment, but noted that it had a firm duty to make sure the system worked fairly and that defendants had the right to fully confront and evaluate the evidence that will be used against them in a timely fashion. The district court denied the government's motion to reconsider or, in the alternative, for a one-week continuance so defendants could review and respond to the DNA evidence. The district court also advised Irvin that, if he continued to represent himself, he would not be tried with Davis and Moyer on April 3 and that the DNA evidence would probably be admissible against him in his trial at a later date. After consulting with his stand-by counsel, Irvin withdrew his motion to proceed pro se, requested that representation by counsel and acknowledged that he would be going to trial with his co-defendants on April 3. The government immediately filed its notice of appeal.

On April 3, 2000, the district court further explained its reasons for granting the motion to exclude the DNA evidence. The district court noted that on March 31 the government had furnished the district court and defense counsel with the written report on the DNA evidence that it planned to introduce at trial, which had been scheduled to begin on April 3. The day before, March 30, the government had informed the district court that the DNA testing had been completed and that the preliminary results matched the bank robbery evidence to defendants. The district court characterized the DNA evidence as "critical" to the government's case. The district court also noted that defendants had been arrested on January 7, 2000, and that hair and saliva samples that had been taken from them shortly after arrest and the bank robbery evidence had been delivered to the state crime lab on February 4.

The district court noted that, at the arraignment on February 18, trial was scheduled to begin April 3 and the government's discovery deadline was February 28. The district court acknowledged that the state crime lab was overburdened and understaffed, but noted that Bush testified that he was not notified about the April 3 trial date and that the government had not requested expedited testing until March 24, a little more than a week before trial was scheduled to begin. The district court found that the government had acted with reckless disregard of the discovery deadline, noting that, if DNA evidence is to be used, it must be processed in a timely fashion so as not to interfere with defendants' right to a speedy trial. The district court acknowledged that, although it might appear that the untimely DNA evidence could have been handled by granting a 30-day continuance, without violating defendants' speedy trial rights, that solution would not have addressed the district court's significant scheduling problems, which were in part due to the dramatic increase in the number of indictments in the district. The district court observed that scheduling decisions had been made for the week of April 3 after the regularly scheduled meeting on March 27, at which the government had not mentioned the possibility of delay due to DNA testing; other criminal cases had been continued based in part on representations by the government that this case was ready to go to trial; the government did not raise the possibility of delay until March 30 and did not provide the written report on the DNA evidence until March 31, when it was too late to reschedule previously continued criminal cases for trial during the week of April 3. The district court refused to condone the government's last-minute production of evidence by allowing the evidence to be introduced at trial and thereby forcing the defense to seek a continuance. This interlocutory appeal followed.

For reversal, the government argues that the district court abused its discretion in excluding the DNA evidence as a discovery sanction. The government argues that it did not act intentionally or in bad faith, defendants were not prejudiced because they did not seek a continuance in order to respond to the DNA evidence and a continuance would not have violated their speedy trial rights, and a less severe sanction, such as a

continuance, could have been imposed, despite the burden on the district court's schedule. Defendants emphasize that the district court has broad discretion in selecting the appropriate sanction for discovery violations. Defendants argue that the government knew the discovery deadline was February 28, but failed to request expedited testing until March 24, offered no explanation of why it did not do so before that date, and failed to notify the district court or defense counsel about the possibility of delay due to DNA testing until March 30, right before trial was scheduled to begin. Defendants note that they had been in custody since their arrest and that the DNA evidence was not only untimely but was not provided to the defense until the Friday before the Monday that trial was scheduled to begin.

We review the district court's decision to impose sanctions and its choice of sanction for abuse of discretion. See, e.g., United States v. DeCoteau, 186 F.3d 1008, 1009 (8th Cir. 1999). The district court has broad discretion in imposing sanctions on parties for failing to comply with discovery orders. See Fed. R. Crim. P. 16(d)(2) (expressly providing for excluding evidence as a sanction).

> In determining a suitable and effective sanction, a court must weigh the reasons for the government's delay and whether it acted intentionally or in bad faith; the degree of prejudice, if any, suffered by the defendant; and whether any less severe sanction will remedy the prejudice and the wrongdoing of the government.

United States v. Hastings, 126 F.3d 310, 317 (4th Cir. 1997) (holding dismissal of indictment was too severe a sanction), cert. denied, 523 U.S. 1060 (1998). "[T]he three factors merely guide the district court and do not dictate the bounds of the district court's discretion." United States v. Russell, 109 F.3d 1503, 1510-13 (10th Cir.) (footnote omitted) (discussing discovery sanctions in non-Rule 16 context for violation of reciprocal agreement to disclose witnesses prior to trial, citing United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir. 1988) (noting that factors to be considered-- reason for delay, prejudice, and feasibility of curing prejudice with a continuance

instead of excluding evidence-- were neither exhaustive nor dispositive)), <u>cert. denied</u>, 521 U.S. 1126 (1997).

We hold that the district court did not abuse its discretion in deciding to sanction the government for what was an obvious discovery violation. The government does not defend its failure to comply with the discovery deadline. Rather, the government argues that the district court abused its discretion in imposing the severe sanction of excluding evidence rather than granting a continuance. This is a closer question, but we also conclude that the district court did not abuse its discretion in excluding the DNA evidence as a discovery sanction.

REASON FOR DELAY

Because the government has not given any explanation for the delay, it is difficult, if not impossible, to assess whether the government had any justification for the delay. <u>Compare United States v. Mavrokordatos</u>, 933 F.2d at 847-48 (report of government's principal witness was 9 days late, but witness had been assigned by superiors to important duty in connection with foreign visitor and defense counsel had heard witness testify at preliminary hearing and cross-examined him and had been offered opportunity to inspect discovery material referred to by witness). The district court found that the government acted with reckless disregard for the discovery deadline. The government did not seek a continuance or otherwise challenge the discovery deadline. The government was in charge of the prosecution of the case, and the orderly procurement of evidence, particularly evidence as probative as DNA evidence can be, was obviously important to the presentation of its case-in-chief. The government could have easily complied with the discovery deadline had it made any effort to check on the status of the DNA testing or the necessity for requesting expedited testing. According to the testimony of the state crime lab criminalist, had the government notified him of the discovery deadline or requested expedited testing in a

timely manner, he would have assigned the case priority and would almost certainly have been able to meet the discovery deadline.

PREJUDICE TO DEFENDANTS

The district court did not make an express finding of prejudice. However, we believe that a finding of prejudice can be inferred from the district court's comments and is supported by the record. The government not only produced the DNA evidence a month late, but it did so almost literally on the eve of trial, making it virtually impossible, absent a continuance, for defendants to evaluate and confront the evidence against them. DNA evidence is scientific and highly technical in nature; it would have required thorough investigation by defense counsel, including almost certainly retaining an expert witness or witnesses. Although the government's discovery deadline was February 28, the government did not provide the preliminary DNA report to the defense until March 30 and the written DNA report until March 31, which was the Friday before the Monday that trial was scheduled to begin. Compare United States v. DeCoteau, 186 F.3d at 1011-12 (government disclosed witnesses 2 days late but 12 days prior to trial and listing similar cases); United States v. Maples, 60 F.3d 244, 246-47 (6th Cir. 1995) (evidence was disclosed 5 weeks after order granting disclosure but 7 weeks before scheduled trial date). Moreover, the government did not even advise the district court or defense counsel until March 30 that DNA testing was in progress. In fact, the government had assured the district court at the scheduling meeting on March 27 that the case was ready for trial.

We agree with the district court that the fact that hair and saliva samples had been taken from defendants shortly after their arrest did not necessarily put defendants on notice that DNA evidence would be introduced during the trial, especially when the government did not produce any DNA evidence by the discovery deadline.

-10-

CHOICE OF SANCTION

As noted above, defendants did not request a continuance. The government argues that defendants' failure to request a continuance waived any claim of prejudice as a result of the untimely production of the DNA evidence. See, e.g., United States v. Candelaria-Silva, 162 F.3d 698, 703 (1st Cir. 1998). "As a general rule, a defendant who does not request a continuance will not be heard to complain on appeal that he [or she] suffered prejudice as a result of late-arriving discovery." United States v. Sepulveda, 15 F.3d 1161, 1178 (1st Cir. 1993) (noting defendants did not request a continuance and never explained how delays in production caused them any cognizable harm; record showed defendants "assimilated the new material without any perceptible hitch and used it to good effect"), cert. denied, 512 U.S. 1223 (1994). "Thus, in situations where defense counsel does not seek a continuance upon belated receipt of discoverable information, a court often can assume that counsel did not need more time to incorporate the information into the defense's game plan." Id. However, this general rule does not apply here because the district court had excluded the DNA evidence; there was no need for the defense to seek a continuance. The district court refused to condone the government's last-minute production of the DNA evidence by allowing the evidence to be presented at trial and thereby forcing defendants to seek a continuance.

The district court considered whether it could remedy the prejudice by granting a less severe sanction than exclusion of the evidence, that is, a continuance in order to allow defendants time to review and rebut the DNA evidence. The district court rejected a continuance because granting a continuance would have ignored significant scheduling problems. Because of the government's last-minute production of the DNA evidence, it was too late to reschedule for trial other previously continued criminal cases, which would have left the district court with a very crowded criminal docket but no criminal case ready for trial.

This case is similar to <u>United States v. Wicker</u>. In that case the district court required the government to produce a lab report by September 18. The government produced the report on October 2. The defendants filed a motion in limine to prevent the government from introducing into evidence the report or the testimony of the expert who prepared the report, claiming that the delayed production did not give defense counsel sufficient time to analyze and rebut either the report or the testimony before the trial date. The government explained the delay by claiming that the expert had been negligent in failing to send copies of the report to the government as requested. The district court suppressed the evidence and the court of appeals affirmed. The court of appeals agreed with the district court that the government's reason did not justify the delay, the defendants had been prejudiced by the late production, and a continuance would not have remedied the prejudice, in view of the district court's pressing schedule, the status of the case (the jury had been selected and trial was ready to begin), and the failure of a prior continuance and deadlines to ensure timely discovery. 848 F.2d at 1061-62. The district court had specifically noted that "scheduling constraints imposed by other cases on its docket would not allow a continuance without prejudicing the parties in other criminal matters." <u>Id.</u> at 1061.

We cannot say that the district court abused its discretion in deciding that excluding the DNA evidence was the least severe sanction likely to remedy the prejudice and deter future wrongdoing on the part of the government.

> It may well be true that alternative sanctions are adequate and appropriate in most cases, but it is equally clear that they would be less effective than the preclusion sanction and that there are instances in which they would perpetuate rather than limit the prejudice to the [defense] and the harm to the adversary process.

<u>Taylor v. Illinois</u>, 484 U.S. 400, 413 (1988). Here, the government was more than negligent; the district court found that the government had acted in reckless disregard of the discovery deadline and offered no explanation for its failure to comply. The

government could have easily complied with the discovery deadline by checking with the state crime lab on the status of the testing or the need to request expedited testing. The government waited until almost a month after the discovery deadline to request expedited testing and did not notify the district court or the defense about the DNA testing or the possibility of a delay until two days before trial was scheduled to begin. Nor can we agree that there was no tactical advantage to be gained by the government as a result of the delay; but for the district court's exclusion order,[3] highly prejudicial evidence would have been admitted against defendants and, even with a continuance, the defense would have been forced to play catchup.[4]

Finally, "[e]ven in the absence of prejudice, [the] integrity [of the judicial process] and scheduling considerations alone may justify suppression of otherwise admissible evidence offered by the delinquent party [if the discovery violation was intentional or willful]." United States v. Russell, 109 F.3d at 1511, citing Taylor v.

---

[3]One cannot ignore that it is unusual for the government to be sanctioned for a discovery violation by suppressing or excluding the evidence, whereas "[c]ourts have often determined that a court's preclusion sanction is not an abuse of discretion where the offending party is the [criminal] defendant." United States v. Gonzales, 164 F.3d 1285, 1295 (10th Cir. 1999) (McKay, J., concurring in part and dissenting in part) (cautioning against application of a seemingly more lenient standard to misconduct by government attorneys than to conduct by criminal defense counsel).

[4]Delayed disclosure is inconsistent with the discovery obligations set forth in Fed. R. Crim. P. 16, which are designed

> to contribute to the fair and efficient administration of justice by providing the defendant with sufficient information upon which to base an informed plea and litigation strategy; by facilitating the raising of objections to admissibility prior to trial; by minimizing the undesirable effect of surprise at trial; and by contributing to the accuracy of the fact-finding process.

Id. (advisory committee note).

Illinois, 484 U.S. at 416. Here, the district court found a reckless discovery violation and prejudice. Recklessness is arguably equivalent to the combination of negligence and the failure of a prior continuance in United States v. Wicker, 848 F.2d at 1061-62. We hold that the district court was justified in excluding evidence that was produced late because of the government's reckless misconduct and that prejudiced the defense, rather than granting a continuance, in order to maintain the integrity of the judicial process and respect the pressing scheduling problems of the district court.

Accordingly, we affirm the order of the district court excluding the DNA evidence as a discovery sanction against the government. The district court did not decide and we express no opinion on whether the DNA evidence would be admissible to rebut defendants' alibi defense.

WOLLMAN, Chief Judge, dissenting.

Because I believe that the sanction imposed was not commensurate with the prejudice resulting from the government's failure to comply with the discovery deadline, I must respectfully dissent from the court's opinion.

With all due respect to the broad discretion that a district court of necessity must possess to control its schedule and to maintain the integrity of the judicial process, I believe that the exclusion of evidence that the district court itself characterized as "critical" to the government's case resulted in prejudice greater than that which would have resulted had the government's request for a continuance been granted. The public has an interest in the effective prosecution of public offenses, especially one involving the level of violence and terror that was exhibited by the defendants in the present case. The exclusion of critical evidence is a sanction that should be imposed only if the government has been guilty of flagrant misconduct resulting in substantial prejudice to the defendant. Cf. United States v. DeCoteau, 186 F.3d 1008, 1010 (8th Cir. 1999); United States v. Tulk, 171 F.3d 596, 598 (8th Cir. 1999).

-14-

Had the district court granted the motion for continuance, it would have lost a week of valuable trial time, there being no alternative case available for trial on April 3. As it turned out, of course, that is what occurred as a result of the denial of the motion, with the additional prejudice to the defendants of their having to languish in confinement for what will have been at least an additional twelve months. Although the continuance would not have addressed the court's scheduling problems (which I do not for a minute minimize, given the dramatic increase in the number of indictments in the district), those scheduling problems, however significant and burdensome, must be weighed in the balance against the public's right to have these defendants brought to book with all the evidence the government has within its power to present.

Weighing the circumstances before the district court in the light of the factors and the authorities set forth in the court's opinion, I am forced to conclude that the district court erred in imposing the sanction of exclusion when the lesser sanction of continuance would have protected the rights of the defendants, see, e.g., United States v. Johnson, 228 F.3d 920, 926 (8th Cir. 2000); United States v. DeCoteau, 186 F.3d at 1010, notwithstanding the fact that it would have resulted in a not inconsiderable disruption in the court's schedule. Accordingly, I respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-15-