# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1330

_____

United States of America,        *

          *

        Appellee,        *

          *

      v.          *

          *

James Allen Stenger,        *

          *

        Appellant.        *

_____

No. 09-1499          Appeals from the United States
District Court for the
_____          Southern District of Iowa.

United States of America,        *

          *

        Appellant,        *

          *

      v.          *

          *

James Allen Stenger,        *

          *

        Appellee.        *

_____

No. 09-1694

_____

United States of America,        *

          *

        Appellee,        *

          *

v.                                  *
                                    *
Michael Rowan Knutson,              *
                                    *
          Appellant.                *
                         _____

                 Submitted: January 14, 2010
                     Filed:  May 14, 2010
                         _____

Before LOKEN, Chief Judge,[1] JOHN R. GIBSON, and WOLLMAN, Circuit Judges.
                         _____

WOLLMAN, Circuit Judge.

     James Allen Stenger and Michael Rowan Knutson were indicted on charges of
bank robbery, in violation of 18 U.S.C. § 2113(a) and (d), and use of a firearm in
relation to a crime of violence, in violation of 18 U.S.C. § 924(c). The men were tried
separately and convicted on both the bank robbery and firearm charges.[2]  In this
consolidated appeal, Stenger and Knutson challenge their convictions on numerous
grounds.  Knutson argues that (1) the district court[3] should have dismissed the
superseding indictment in his case because the government engaged in vindictive
prosecution; (2) the district court abused its discretion in admitting evidence of
uncharged crimes; and (3) the evidence was insufficient to support the firearm
conviction.  Stenger argues that (1) the district court abused its discretion in admitting

_____

     [1]The Honorable James B. Loken stepped down as Chief Judge of the United
States Court of Appeals for the Eighth Circuit at the close of business on March 31,
2010.  He has been succeeded by the Honorable William Jay Riley.

     [2]Knutson was also acquitted on charges related to a separate bank robbery.

     [3]The Honorable Robert W. Pratt, Chief Judge, United States District Court for
the Southern District of Iowa.

testimony from two cooperating witnesses, and that (2) the evidence was insufficient to support both the bank robbery conviction and firearm conviction. The government cross appeals, arguing that the district court erred in sentencing Stenger. We affirm the district court's rulings in all respects.

I.

On May 16, 2007, two men conducted a takeover-style robbery of First Bank in West Des Moines, Iowa. Four bank employees witnessed the robbery, which was also captured on the bank's surveillance video cameras. The witnesses described the first individual, whom the government later alleged to be Knutson, as a thin white male, approximately 6'4" tall, wearing a hooded sweatshirt, bandana, sunglasses, and gloves, and carrying a western-style black powder revolver and a police scanner. The second individual, allegedly Stenger, was described as a shorter white male, around 6' tall, also wearing a hooded sweatshirt, bandanna, sunglasses, and gloves, and carrying a silver semiautomatic pistol. Importantly, the bank's surveillance cameras showed that the shorter individual's sweatshirt was dark in color with a diamond-shaped logo on the front and a white discoloration on the left sleeve. The taller perpetrator also wore a distinctive pair of black motorcycle boots with a buckle visible in the middle of the boot. Frank Sanchez, a First Bank employee, testified that the taller perpetrator threatened to "cap" him if he did not cooperate. The robbery lasted only a few minutes, after which the two individuals took more than $11,000 and fled through the bank's rear door and toward an adjacent alley. Surveillance video from a nearby business showed a two-toned extended cab Dodge pickup truck driving away from the bank just moments after the robbery.

Investigators initially had few leads regarding the perpetrators' identities. About one month after the robbery, however, the Des Moines police responded to a report of drug activity at a local motel, where they found Stenger, Knutson, and an individual named Dixie Robinson together in a motel room. Stenger's vehicle was

parked near the room, and he gave police consent to search it. The police found a leather coat and a loaded black powder revolver, which Knutson admitted that he owned.

On July 26, 2007, an individual robbed the US Bank in Des Moines, Iowa. The police quickly discovered that Robinson was the perpetrator, and when interviewed, she told investigators that Stenger and Knutson had committed the earlier robbery of First Bank. Based on this information, the police began an investigation of Stenger and Knutson, which eventually led to their arrests and searches of the places where they were known to have resided.

A search of Stenger's residence yielded a dark sweatshirt with a triangle-shaped logo on the front and a white discoloration on the left sleeve. The search of Knutson's residence produced black powder gun accessories, motorcycle boots similar to those worn by the taller bank robber, and other incriminating evidence. The police further learned that at the time of the First Bank robbery Knutson had owned a two-toned Dodge pickup truck like the one captured on the surveillance video. They also discovered that Stenger bought a used car the day after the First Bank robbery, using $1,750 in cash to make the purchase.

Stenger and Knutson adopted conflicting defense strategies in which they each conceded the other's involvement in the crime, but challenged their own identities as the second of the two bank robbers. Although Stenger and Knutson were tried separately, the evidence presented at the two trials was largely the same. The evidence included the surveillance videos, testimony from the four First Bank employees, items seized from the searches, and other relevant information uncovered by the investigation. In addition, the government introduced testimony from three cooperating witnesses. Robinson testified that Stenger admitted robbing First Bank and that she had observed Stenger and Knutson arriving at a mutual friend's house on the day of the robbery in a two-toned Dodge pickup truck with a black duffle bag and

guns.  According to Robinson, Stenger and Knutson waited at the house until dark, before heading to Mason City, Iowa.  Two jailhouse witnesses, Antonio Sheley and Gary Wessel, testified about statements that Stenger and Knutson made while incarcerated before trial.  Sheley, an acquaintance of Stenger, testified that he had had a conversation with Stenger in which Stenger admitted that he and Knutson had used firearms to rob First Bank and that the police had located a sweatshirt that Stenger wore during the robbery.  Sheley also testified that Stenger confessed to hiding the weapon he had used, which Sheley understood to be a 9mm semiautomatic handgun.  Wessel, another jail inmate, testified that Stenger admitted committing the robbery with Knutson.  Wessel further testified that he had had a conversation with Knutson in which Knutson said to "tell Stenger he had a hundred thousand dollars if he could get him out of this mess."

The government introduced evidence at both trials of two similar bank robberies that occurred in Mason City on April 10, 2007, and July 14, 2007.  Like the First Bank robbery, the Mason City robberies involved relatively small branch banks with several teller windows and a small drive-up window.  The Mason City robberies were committed by a single individual who appeared similar to the taller perpetrator in the First Bank robbery.  In each instance, the robber conducted a takeover-style robbery wearing a mask and hooded sweatshirt and carrying a black powder revolver.  An employee who witnessed one of the Mason City robberies also testified that the robber threatened to "cap" the customers if they refused to sit down and remain calm.  FBI Agent Jeff Atwood testified at Stenger's trial that in his experience the perpetrator's use of a black powder revolver was very unusual.  Officer Paul Castalline of the West Des Moines Police Department testified at Knutson's trial that the black powder revolver was "particularly unique," a weapon he did not recall seeing in any robberies during his 30-year career.

The government's theory was that Knutson committed the Mason City robberies as part of a larger crime spree that included the robbery of First Bank.

During the time of the robberies, Knutson was in the process of moving to Mason City, and the evidence indicated that he was making regular trips between Mason City and Des Moines. Knutson objected to the introduction of evidence of the Mason City robberies on the ground that they involved uncharged criminal conduct that was unfairly prejudicial to his defense. The district court overruled Knutson's objection, holding that the robberies were intrinsically linked to the charged crimes and that, in any event, the evidence was admissible under Federal Rule of Evidence 404(b).

Following the convictions, Knutson was sentenced to consecutive life sentences as a career offender, pursuant to 18 U.S.C. § 3559. At Stenger's sentencing, the parties agreed that the applicable guideline range was 360 months to life imprisonment. The district court then varied significantly from the guideline range and imposed a sentence of 180 months' imprisonment.

II.

We turn first to Knutson's arguments that (1) the district court erred in refusing to dismiss the government's three-strikes notice and superseding indictment on the grounds of vindictive prosecution, and (2) the district court abused its discretion in admitting evidence of the Mason City robberies.

A. Vindictive Prosecution

Knutson was originally charged in a single count indictment with bank robbery and use of a dangerous weapon. In the initial plea negotiations, Knutson and the government discussed the possibility of a twenty-year sentence. The government made clear, however, that it believed Knutson qualified as a career offender and would be subject to mandatory life imprisonment if the government filed a three-strikes notice under 18 U.S.C. § 3559. The government states that it told Knutson it intended to file the § 3559 notice if the parties did not reach an agreement. Knutson alleges

that the government insisted on a plea that would result in a twenty-year sentence, including any decrease based on Knutson's substantial assistance. After the plea negotiations ended without an agreement, the government filed additional charges and sought a mandatory life sentence. Knutson argues that this series of events constituted vindictive prosecution in violation of his right to due process of law.

There is a split of authority within our circuit on the standard of review for a district court's denial of a defendant's motion to dismiss charges on the basis of prosecutorial vindictiveness. United States v. Campbell, 410 F.3d 456, 461 (8th Cir. 2005) (listing cases variously applying the *de novo*, clear error, and abuse of discretion standards). Under any standard of review, however, Knutson's argument fails. "There is no due process violation when a defendant is openly presented with the 'unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution.'" Luna v. Black, 772 F.2d 448, 449-50 (8th Cir. 1985) (quoting Bordenkircher v. Hayes, 434 U.S. 357, 365 (1978)). Nothing more happened here. Knutson was plainly subject to additional charges, and he accepted the risk that he would face a lengthier sentence if he chose not to plead guilty. The government's frank assertion that it would file a § 3559 notice if the parties did not reach an agreement was not, as Knutson alleges, an improper threat. Cf. Campbell, 410 F.3d at 462 ("An example of objective evidence of a vindictive motive would be a prosecutor's statement that he or she is bringing a new charge in order to dissuade the defendant from exercising his or her legal rights."). Rather, it was precisely the kind of candid disclosure of the government's bargaining position that is permissible in the context of plea negotiation. Knutson has produced no objective evidence that the government acted with an improper or vindictive motive. Accordingly, the district court did not err in refusing to dismiss the three-strikes notice and the superseding indictment.

B. Evidence of the Mason City Robberies

Knutson argues that the district court abused its discretion by allowing the government to introduce evidence of the Mason City robberies. He contends that there was insufficient evidence connecting him to those other crimes and that the evidence was therefore of little value in establishing his identity. Knutson also argues that he was unfairly prejudiced by the admission of the evidence because of the dramatic nature of the testimony and bank surveillance footage.

Evidence of other criminal acts, though not admissible to demonstrate a defendant's propensity to commit a crime, may be admitted for other purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). "Such evidence is admissible if it is (1) relevant to a material issue; (2) similar in kind and close in time to the crime charged; (3) proven by a preponderance of the evidence; and (4) if the potential prejudice does not substantially outweigh its probative value." United States v. Oman, 427 F.3d 1070, 1075 (8th Cir. 2005). The district court has broad discretion in admitting evidence under Rule 404(b), and we will reverse its decision only when the evidence clearly has no bearing on any legitimate issues and is introduced solely to establish the defendant's propensity to commit a crime. Id. at 1074-75.

Knutson's argument at trial was that some other person was involved in the robberies; thus, the central issue was one of identity. Evidence of other crimes may be relevant to establishing identity if a reasonable juror could conclude that the same person committed both crimes. See United States v. Carroll, 207 F.3d 465, 469 (8th Cir. 2000). The crimes, however, must be "sufficiently idiosyncratic to make them clearly distinctive from the thousands of other bank robberies committed each year." Id. at 468 (internal quotation omitted). Factors pertinent to this question include the extent of the similarity between the crimes and their temporal and geographic proximity to one another. Id. at 469.

We conclude that the other robberies were sufficiently similar to the charged crime to establish an identity inference and support admission of the evidence for that purpose. The Mason City robberies occurred within two months of the First Bank robbery, and the locations of the crimes were all within relatively easy driving distance of one another. The circumstances thus suggested that the robberies were related to a single crime spree. Cf. United States v. Smith, 103 F.3d 600, 603 (7th Cir. 1996) (observing that a one month interval and a forty mile distance between two bank robberies strengthened the inference of a common identity). The crimes also involved a distinctive set of signature facts or *modus operandi*. All of the robberies targeted the same type of financial institutions—relatively small banks with several teller windows and a small drive-up window. All of the crimes involved a tall Caucasian male conducting a takeover-style robbery, wearing a mask and hooded sweatshirt, and carrying a black powder pistol. Law enforcement agents testified that the perpetrator's use of a black powder pistol was especially unusual; Officer Castalline could not recall another robbery in his 30-year career in which such a weapon had been used. In addition, one of the Mason City robberies shared another distinctive characteristic with the First Bank robbery, in that the perpetrator threatened to "cap" anyone who did not cooperate with his orders. Based on these factual similarities, the district court could have found that the crimes were sufficiently idiosyncratic to allow admission of the evidence under Rule 404(b).

Although Knutson points out that he was not convicted of the Mason City robberies, he does not contend that his involvement in those crimes was not established by at least a preponderance of the evidence.[4] Knutson likewise cannot

---

[4]Indeed, much of Knutson's argument is based on the incorrect assumption that the government was required to prove his connection to the Mason City robberies beyond a reasonable doubt. To admit evidence under Rule 404(b), the district court must determine only that a jury could find by a preponderance of the evidence that the defendant committed the other alleged act. See United States v. Sparkman, 500 F.3d 678, 685 (8th Cir. 2007) (citing Huddleston v. United States, 485 U.S. 681, 685

show that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Because the same basic inferences were necessary to establish Knutson's involvement in both the charged and uncharged crimes, the jury was unlikely to conclude that Knutson was guilty of robbing First Bank simply because he had robbed other banks and thus had a propensity to commit the crime of bank robbery.[5] Knutson also argues that he was prejudiced because of the dramatic nature of the testimony and surveillance videos concerning the uncharged crimes. Although the cumulative impact of the evidence might warrant some concern, the shock value of the testimony and surveillance footage was likely diminished in the context of a bank robbery trial in which a substantial quantity of very similar evidence had already been admitted. Moreover, the district court gave the jury a limiting instruction that restricted the use of the evidence from the other robberies, thus decreasing the possibility of unfair prejudice.[6] See United States v. Thomas, 398 F.3d 1058, 1063 (8th Cir. 2005) ("[T]he use of a limiting instruction decreases the danger that unfair prejudice will result from admission of [404(b)] evidence."). The district court therefore did not abuse its discretion in admitting evidence of the Mason City robberies.

------

(1988)). The evidence that Knutson committed the Mason City robberies included direct testimony from Robinson, as well as Knutson's physical resemblance to the perpetrator, possession of a black powder pistol, and regular travel between Des Moines and Mason City, among other things. Further, in making the determination, the district court was free to consider the evidence that Knutson committed the First Bank robbery. See Huddleston, 485 U.S. at 691.

[5]We also note that Knutson's acquittal on charges related to a separate bank robbery suggests that the jury was able to examine the evidence supporting each individual charge, rather than relying on the forbidden propensity inference.

[6]Although Knutson now argues that the district court should not have given the limiting instruction, the record indicates that Knutson's objection was not preserved at trial, and we find no plain error in the court's decision to give the instruction.

Finally, even if we were to conclude that the evidence was improperly admitted, Knutson would not be entitled to relief because admission of the evidence did not have a significant influence on the verdict. See Oman, 427 F.3d at 1076 (holding that any error in admission of 404(b) evidence was harmless in light of the strong evidence of the defendant's guilt). Multiple surveillance videos established that Knutson bore a physical resemblance to the taller perpetrator in the First Bank robbery. Knutson was a known associate of Stenger and Robinson during the time when the crime occurred, and he conceded at trial that those individuals were involved in the First Bank robbery and other related crimes. Knutson also possessed a black powder pistol, motorcycle boots, and a pickup truck consistent with those of the perpetrator. Furthermore, three cooperating witnesses testified about Knutson's involvement in the crime. Accordingly, any error in admission of the evidence was harmless.

## III.

We next consider Stenger's arguments that the district court abused its discretion in admitting evidence from two of the government's cooperating witnesses, Gary Wessel and Antonio Sheley.

### A. Gary Wessel's Testimony

Stenger first argues that the district court abused its discretion by allowing Gary Wessel to testify about inculpatory statements that Stenger made while he was in jail awaiting trial. Stenger contends that Wessel's testimony should have been excluded because the government did not inform Stenger that it intended to call Wessel as a witness until the afternoon of the last business day before trial. In reviewing the district court's refusal to exclude testimony on the basis of late disclosure, "we consider (1) whether the Government acted in bad faith and the reason(s) for delay; (2) whether there is any prejudice to the defendant; and (3) whether any lesser sanction is appropriate to secure future Government compliance." See United States

v. Lofton, 557 F.3d 594, 597 (8th Cir. 2009) (internal quotation and alteration omitted).

We find Stenger's argument unpersuasive. "A federal criminal defendant generally has no right to know about government witnesses prior to trial." United States v. Altman, 507 F.3d 678, 680 (8th Cir. 2007) (citing 18 U.S.C. § 3500; Fed. R. Crim. P. 16(a)(2)). Stenger's contrary argument relies on United States v. Davis, 244 F.3d 666 (8th Cir. 2001), a case addressing the government's obligation to produce expert testimony regarding DNA evidence. Davis is inapposite, however, because under the Federal Rules of Criminal Procedure, the government has a special obligation to disclose the substance of expert witnesses' testimony at the defendant's request. See Fed. R. Crim. P. 16(a)(1)(G). That disclosure obligation does not extend to non-expert government witnesses, such as Wessel.

Further, nothing in the record indicates that the government purposely withheld information about Wessel in order to create an unfair advantage at trial. To the contrary, the record reflects that the prosecutor did not know that Wessel had information about Stenger until shortly before the trial commenced. There is also no indication that Stenger was prejudiced by the lack of additional time to investigate the substance of Wessel's testimony. The government provided Stenger's counsel with copies of Wessel's plea agreement and presentence investigation report, and Stenger's counsel was able to conduct a thorough cross-examination. As Stenger's counsel highlighted in cross-examining Wessel, Stenger and Wessel were apparently alone when the inculpatory discussions took place, suggesting that there was little means of proving or disproving Wessel's characterization of the discussion. See Lofton, 557 F.3d at 597 (observing that the defendant was not prejudiced by the government's late disclosure of a witness in part because the inculpatory statements were made when no one else was in the vicinity of the conversation); cf. Davis, 244 F.3d at 671 (stating that the defendants were prejudiced by late disclosure of DNA evidence because "DNA evidence is scientific and highly technical in nature," and evaluation of the

evidence "would have required thorough investigation by defense counsel, including almost certainly retaining an expert witness or witnesses"). Given these circumstances, we conclude that the district court did not abuse its discretion in denying Stenger's motion to exclude Wessel's testimony.

## B. Antonio Sheley's Testimony

Stenger argues that the district court abused its discretion in admitting part of Antonio Sheley's testimony over Stenger's hearsay objection. After Sheley testified about inculpatory statements that Stenger made during his pretrial incarceration, Stenger's counsel sought to challenge Sheley on cross-examination by highlighting his motive for testifying. The following exchange then ensued:

> Stenger's Counsel: All right. So understanding no promise has been made to you and expecting nothing, you still have the hopes that something can be done with regards to your situation maybe. Is that fair?
>
> Sheley: Can I answer the question? Is it alright if I answer it?
>
> Stenger's Counsel: I think you did. You said you hope something can happen?
>
> Sheley: Right. I recently wrote a letter to the U.S. Attorney, and I didn't want to mention this because I don't—I mean I don't know if he received this, but I received threats from your client recently.

Stenger's counsel then objected on the ground that Sheley's answer was nonresponsive to the question. The court sustained the objection, instructing the jury to ignore Sheley's response.

Later, however, the government recalled Sheley, and he was permitted to offer limited testimony about receiving a threat. Sheley indicated that he had received the

-13-

threat from an individual other than Stenger, at which point Stenger's counsel objected that the testimony was hearsay. The record reflects that the parties and the district court were confused about the application of the hearsay rule. The district court apparently concluded that some of the testimony concerning the threat was admissible under the exception for a present sense impression, but the parties now agree that the exception is inapplicable here. Sheley offered additional details over a hearsay objection, testifying that the threat came from Kevin Jordan, another inmate, and that it related to information that Sheley gave the government regarding Stenger. Stenger contends that the district court's admission of this testimony requires reversal. The government responds that testimony about the threat was relevant to establish Sheley's motive for testifying and Stenger's consciousness of guilt.

Although the record lacks detail about the substance of the threat testimony, we are confident that any error in the admission of Sheley's testimony was harmless. As just discussed, it was unclear whether the threat originated from Stenger. When Sheley explained the incident, he testified only that the threat came from Kevin Jordan and that it concerned Sheley's testimony in Stenger's case. Even if the jury did connect the threat with Stenger, it is unlikely that the testimony was a significant factor in the jury's decision to find Stenger guilty. The testimony about the threat was brief and obscure, and the government made only a passing reference to that evidence in its closing argument. Furthermore, as detailed below, the evidence of Stenger's guilt was substantial. Accordingly, admission of the testimony did not constitute reversible error. See United States v. Bercier, 506 F.3d 625, 632 (8th Cir. 2007) (holding that an error in admitting hearsay testimony "is harmless under [Federal Rule of Criminal Procedure] 52(a) 'if the reviewing court, after viewing the entire record, determines that no substantial rights of the defendant were affected, and that the error did not influence or had only a very slight influence on the verdict.'") (quoting United States v. Cortez, 935 F.2d 135, 140 (8th Cir. 1991)).

IV.

Stenger and Knutson both raise arguments regarding the sufficiency of the evidence. Stenger contends that the evidence was insufficient to establish his identity as the shorter perpetrator in the First Bank robbery. Both defendants argue that the evidence was insufficient to support their convictions for use of a firearm in relation to a crime of violence. Because the government concedes that Knutson's black powder pistol did not constitute a firearm under the relevant statute, both defendants' arguments regarding their firearm convictions turn on whether there was sufficient evidence to establish that Stenger carried a firearm during the First Bank robbery.

"We review the sufficiency of the evidence *de novo*, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Hakim, 491 F.3d 843, 845 (8th Cir. 2007) (internal quotation omitted). The verdict will be upheld "if there is any interpretation of the evidence that could lead a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt." Id. (quoting United States v. Hamilton, 332 F.3d 1144, 1149 (8th Cir. 2003)).

A. Stenger's Identity

The evidence adduced at Stenger's trial was more than sufficient to allow a reasonable jury to conclude that Stenger was the shorter perpetrator in the First Bank robbery. Based on surveillance videos and testimony from four eyewitnesses, the jury could have determined that Stenger bore a physical resemblance to the robber. Stenger was a known associate of Knutson, whom Stenger's counsel conceded had robbed First Bank. Stenger purchased a car the day after the robbery, and police seized from Stenger's residence a sweatshirt identical to the one captured on surveillance video. In addition to this circumstantial evidence, three cooperating witnesses testified about Stenger's involvement in the robbery. Although Stenger

-15-

points out that these individuals had a motive to assist the government, significant portions of their testimony were corroborated by other evidence. Moreover, Stenger's counsel had the opportunity to cross-examine each witness, and as we have frequently reiterated, it is the jury's prerogative to determine whether the witnesses' testimony is credible. See United States v. Molsbarger, 551 F.3d 809, 812 (8th Cir. 2009). The district court therefore did not err in holding that the evidence was sufficient to support Stenger's conviction, nor did the court err in denying his motion for a new trial on the same basis. See United States v. Sturdivant, 513 F.3d 795, 802 (8th Cir. 2008) (standard of review).

## B. Stenger's Weapon

Stenger and Knutson argue that the evidence was insufficient to establish that Stenger carried a real firearm during the First Bank robbery, as opposed to a toy gun. When, as here, the gun at issue is not introduced in evidence at trial, a defendant's possession of a firearm may be established solely by eyewitness testimony. See United States v. Garcia-Hernandez, 530 F.3d 657, 662 (8th Cir. 2008). The mere possibility that the weapon could have been fake does not preclude a reasonable jury from finding that the gun was real; the government is not required to disprove the theoretical possibility that the defendant carried only a sophisticated toy. Id. at 663 (citing United States v. Jones, 16 F.3d 487, 491 (2d Cir. 1994)).

We conclude that the evidence was sufficient to establish that Stenger carried a real firearm. The jury had the opportunity to review the bank surveillance videos, which were carefully scrutinized frame-by-frame throughout both trials. Four bank employees testified about the robbery after having observed the gun at close range. At Stenger's trial, for example, bank employee Chani Carter testified that Stenger's weapon "looked a little more real" than Knutson's black powder pistol. Robinson testified that Stenger and Knutson were both carrying guns on the day of the robbery and that Stenger had a handgun that was loaded with a clip. That description was

consistent with Antonio Sheley's testimony that Stenger confessed to carrying a weapon, which Sheley believed to be a 9mm handgun. The fact that the witnesses were not weapons experts or that they did not inspect and verify the authenticity of the gun does not preclude conviction for use of a firearm. The jurors were free to reach a logical conclusion based on the totality of the evidence presented at the trials, and a reasonable jury could have found that Stenger carried a firearm during the First Bank robbery.

V.

We turn to the government's cross-appeal of Stenger's sentence. As detailed above, the district court determined that the applicable guideline range for Stenger's offenses was 360 months to life imprisonment. The district court then imposed a sentence of 180 months' imprisonment, varying significantly from the guideline range. In sentencing Stenger, the court observed that there was very little of Stenger's life where he had not been in trouble with the law in some way. The court stated that given his age and the length of the sentence, Stenger would probably not pose a serious threat to public safety by the time he was released. The court also considered Stenger's lengthy battle with substance abuse, the fact that no one was injured in the robbery, and the absence of adverse statements from the robbery victims in the presence report before concluding that a 180-month sentence was sufficient but not greater than necessary.

The government did not object to the adequacy of the district court's explanation of Stenger's sentence, and as it now concedes, our review is for plain error. See United States v. Molnar, 590 F.3d 912, 915 (8th Cir. 2010). To establish plain error, the government must show that (1) there was error, (2) the error was plain, and (3) the error affected its substantial rights. Id. The government has not met this burden with respect to either the procedural or substantive aspects of Stenger's sentencing.

A district court commits procedural error in sentencing a defendant if it fails to properly calculate the guidelines range, treats the guidelines as mandatory, fails to consider the factors set forth in 18 U.S.C. § 3553(a), selects a sentence based on clearly erroneous facts, or fails to adequately explain its chosen sentence. United States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009) (en banc). Our review of the record satisfies us that there was no plain error in the procedure that the district court followed in imposing Stenger's sentence. The district court recognized both the applicable guideline range and its discretion to vary from the guidelines. The court also explicitly considered several factors in § 3553(a). See id. (stating that a "mechanical recitation" of the § 3553(a) factors is not required). Although the government disagrees with the district court's characterization and evaluation of the relevant facts, the court did not rely on any clearly erroneous finding of fact that would justify reversal.[7] Cf. Molnar, 590 F.3d at 915-16 (vacating the defendant's sentence and remanding for resentencing where the district court's factual finding was inconsistent with clearly established Arkansas law and witness testimony in the case).

Nor is it obvious that Stenger's sentence was substantively unreasonable. "[B]ecause the Guidelines are now advisory only, 'substantive appellate review in sentencing cases is narrow and deferential.'" Feemster, 572 F.3d at 464 (quoting

---

[7]The government also argues in a letter submitted pursuant to Fed. R. App. P. 28(j) that the district court erred in considering the mandatory nature of the firearm charge as a basis for a lower sentence on the underlying bank robbery charge. We recently reiterated that "the severity of a mandatory consecutive sentence for a § 924(c)(1)(A) offense is an *improper factor* that the district court may not consider when sentencing a defendant on related crimes of violence." United States v. Williams, No. 09-1907, 2010 WL 724655, at *2 (8th Cir. Mar. 4, 2010) (internal quotation omitted). The sentencing transcript indicates that the court independently considered the appropriate sentence for Stenger's bank robbery conviction, although the court made a brief reference to the mandatory nature of the firearm charge in determining the overall sufficiency of both sentences. In the circumstances of this case, we conclude that the government has not demonstrated plain error.

United States v. Gardellini, 545 F.3d 1089, 1090 (D.C. Cir. 2008)). Whether we might have imposed a more stringent sentence in the first instance is not the relevant question; Stenger's 180-month sentence, though lenient, was within the bounds of reason, and defendant-specific sentencing determinations fall within the special competence of the district court. Accordingly, we conclude that there was no plain error in the district court's imposition of Stenger's sentence.

## VI.

The judgments are affirmed.

_____