# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: _____**

**Filing Date:  February 15, 2016**

**NO. S-1-SC-34504**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.

**DORALL SMITH,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Ross C. Sanchez, District Judge**

Jorge A. Alvarado, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant


Hector H. Balderas, Attorney General
Adam Hartley Greenwood, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**VIGIL, Chief Justice.**

{1}     Defendant Dorall Smith appeals his convictions for first-degree murder, contrary to NMSA 1978, Section 30-2-1(A)(1) (1994), and criminal damage to property, contrary to NMSA 1978, Section 30-15-1 (1963). Defendant challenges his convictions on ten grounds, arguing that: (1) there was insufficient evidence of deliberate intent to support a conviction for first-degree murder; (2) the trial court abused its discretion by allowing the State to use recalculated DNA results that were not disclosed to Defendant until the eve of trial, necessitating that defense counsel retain its own expert midtrial to analyze the DNA evidence; (3) the trial court abused its discretion by ordering defense counsel to obtain a DNA expert midtrial, and then requiring that expert to expedite his analysis; (4) the trial court improperly admitted autopsy photographs and the testimony of a supervising pathologist in violation of the constitutional right to confrontation; (5) the trial court abused its discretion by allowing evidence of prior bad acts contrary to its previous order in limine; (6) the trial court abused its discretion by joining Defendant's two cases; (7) a three-year delay amounted to a violation of Defendant's constitutional right to a speedy trial; (8) Defendant received ineffective assistance of counsel; (9) the trial court abused its discretion by denying Defendant's motions for mistrial; and (10) his convictions

should be reversed based on a theory of cumulative error in light of the aforementioned.

{2} We reject each of Defendant's claims of error and affirm his convictions for first-degree murder and criminal damage to property. While settled New Mexico law squarely controls nine of the ten issues Defendant raises on appeal, we proceed to render this opinion to clarify New Mexico's law regarding whether autopsy photographs of a murder victim's wounds are testimonial statements constituting hearsay banned under the Confrontation Clause. We hold that the autopsy photographs at issue in this case, depicting a murder victim's wounds, are not testimonial statements and thus do not implicate Defendant's Sixth Amendment right to confront this evidence against him.

**I.    BACKGROUND**

{3} In the afternoon of September 1, 2010, Defendant saw Victim and her boyfriend Antonio Womack from across the street. Defendant walked towards them in a threatening manner, saying "what's up, bitch?" and "[y]eah, I'm going to get you." Defendant had previously been Victim's boyfriend and lived with her for four months. Upon seeing Defendant, Victim made a point of kissing Womack, presumably to make Defendant jealous.

{4}     That night, Defendant planned to stay with childhood friend Electa Hart and her boyfriend Ashante Roberts. Defendant was wearing jeans but asked to borrow a pair of Roberts' shorts. Sometime that evening Defendant left Hart's apartment to hang out and drink with friends at Hart's brother's apartment. Around midnight, Defendant returned to Hart's apartment and borrowed her phone. Using Hart's phone, Defendant texted and called Victim repeatedly.

{5}     The last call to Victim's phone came from Hart's phone at 3:40 a.m. on September 2, 2010. It appears Victim hid her cell phone under a stuffed animal in her room before going outside the apartment, presumably to meet Defendant. At around the same time a neighbor heard faint screaming and calls for help but thought nothing of it. Victim was stabbed approximately ninety times. The stab wounds included some to her cheek, sinus, ribs, and neck. As she tried to defend herself, she suffered additional lacerations on her arm. Most of the wounds were shallow and penetrated only the skin and underlying tissue, though some penetrated straight to the bone and skull. The most significant injuries were to her trachea, neck muscles, and external jugular vein. Victim bled significantly. And, as a detective testified, the attack was prolonged enough for her to move around, evidenced by multiple pools of blood. At one point the assailant may have walked away, only to return and attack again. The

assailant also slashed the tires of the vehicles in Victim's driveway, and went inside her home, dripping blood and leaving bloody shoe and hand prints along the way. At trial, the DNA expert could not exclude Defendant as a donor to various blood samples taken from the driveway, vehicles in the driveway, and Victim's home.

{6}     It was impossible for investigators to determine how long it took for Victim to bleed to death, but early that morning, before 5:00 a.m., a man on a paper route discovered Victim's body and called the police. Meanwhile, Defendant had returned to Hart's home, staining the shower mat in her bathroom with blood. At trial, the DNA expert testified that Victim could not be excluded as a donor to some of the blood samples taken from Hart's home.

{7}     Later that morning, when Roberts asked Defendant what had happened to Defendant's jeans, Defendant said he had thrown them away. Defendant also had a large cut on his hand—which he claimed happened while he was fooling around with a knife—so Hart and Roberts took him to the hospital. On the way to the hospital, Defendant kept repeating, "Why do I keep thinking about this girl named [Victim's name]?" Just prior to his arrest, Defendant told a stranger at a convenience store that he had hurt his hand when he "got into it" with his girlfriend.

{8}     Defendant was indicted on a first-degree murder charge and two charges of

4

evidence tampering. In a separate case rising from the same incident Defendant was charged with aggravated burglary and criminal damage to property. The State moved to join the cases pursuant to Rule 5-203 NMRA in December 2011, and the trial court joined the two cases on September 17, 2013. The trial court dismissed the aggravated burglary charge and granted a directed verdict on the two counts of evidence tampering. Defendant was ultimately found guilty of the remaining charges of first-degree murder and criminal damage to property.

{9} Numerous issues arose at trial, stemming primarily from the State's request to recalculate DNA evidence results. At the pretrial hearing on September 17, 2013, the State asked for a ten-day continuance of the trial because the State's DNA expert Donna Manogue had just informed the prosecutor that the DNA results for four samples from this case needed to be recalculated with different statistical ratios. Although Manogue had been issued a subpoena for this trial on August 19, 2013, she had not actually received it until September 16, 2013, resulting in the late notice. According to the prosecutor, Manogue believed that a memorandum had been sent to some prosecutors in May regarding the need to recalculate certain DNA results, but as of the date of the pretrial hearing this particular prosecutor had not received the mass-email notification. The prosecutor later confirmed that a mass-email was sent

5

by another prosecutor concerning DNA recalculations, but she missed it.

{10}     The trial court suggested commencing the trial and then delaying it for a couple of days to allow Manogue to complete her reanalysis and obtain peer review. Defense counsel considered whether she might need to consult an expert in order to completely understand the recalculations of the DNA evidence results, and indicated that she would prefer to proceed to trial with the original DNA calculations—but the trial court was concerned that using the original DNA results would deny due process to Defendant. Defense counsel, though, also indicated that if only the original DNA results were used at trial, she would use the recalculations of the DNA results for impeachment. Regardless, the prosecutor responded that Manogue was unwilling to testify based on the original, erroneous DNA calculations. The trial court ordered the prosecutor to call Manogue about expediting her recalculation of the DNA results so that a continuance of the upcoming trial would not be necessary. The prosecutor complied, and Manogue agreed to expedite her recalculations.

{11}     As a result of Manogue's efforts, the State was able to provide the recalculated results to Defendant that same day. At trial two days later, on September 19, 2013, defense counsel asked to interview Manogue about the DNA results. The next day, September 20, 2013, the parties discussed the issue again. Defense counsel once

again asked the trial court to exclude the recalculated results because she needed the assistance of an expert to respond to it. The State responded that Manogue simply could not testify to the original, less-accurate calculations, and that the recalculations gave similar results to the originals—except the chances of the DNA being a mistaken match to Defendant were now identified as being one-in-millions, not one-in-billions. The trial court directed the State to inquire of Manogue once again if she would be willing to testify as to the original erroneous figures because defense counsel had now indicated that she "possibly wouldn't impeach her as to the new stuff." Manogue would not. Defense counsel thus reiterated her inability to address the recalculated results without consulting an expert.

{12}     Upon discussing the matter with her supervisor over the weekend, Manogue indicated that she might be willing to testify just as to the results, and not the need for recalculating the original results—alleviating the problem by simply ignoring the four samples with DNA results that required recalculation. The issue was taken up once again in court on Monday, September 23, 2013. There, Manogue explained in detail why the results from four samples had been recalculated, thereby resulting in more accurate and, in her words, "conservative" results that favored Defendant. She also reiterated that she was uncomfortable with ignoring the recalculations. The

7

conclusions she drew from the original and recalculated results, however, were the same—Defendant could be placed at the scene. The prosecutor again indicated the State's willingness to exclude those four recalculated samples from testimony altogether, and the trial court said that it would nevertheless allow defense counsel to continue to use the recalculations for impeachment at trial. Following these concessions, defense counsel revealed that it was now apparent that she would definitely need an expert, or else she might not be able to provide effective assistance of counsel. The trial court then concluded that it would either have to effectively dismiss the case by barring all the DNA evidence, or else put the case on standby while the defense had an expert perform its review. It further concluded that the defense bore some responsibility for the dilemma because it had vehemently opposed the State's request for a ten-day pretrial continuance.

{13}     The following day, September 24, 2013, the parties reconvened to address the defense's progress in retaining an expert. Defense counsel had made efforts, but the only available expert told her that he could not be ready for two weeks. The trial court asked for the expert's contact information and called him. The expert witness agreed to expedite the review. The trial court placed on the record that in speaking to the expert the trial court mentioned that "the accused had allegedly committed the

8

crimes" and "the State's DNA evidence had to be challenged." Defense counsel argued that the most appropriate remedy, in light of the confusion, was still to exclude all DNA evidence.

{14}    On September 25, 2013, the parties continued discussing the defense expert's review of the DNA evidence, at which point defense counsel objected to the trial court having contacted the defense expert the previous day. The trial court, though, called the defense expert one more time, and the expert indicated over speaker phone that his analysis of the DNA evidence would be completed soon. On September 26, 2013, the trial court continued the trial to allow the defense expert to review the recalculations, anticipating a delay of approximately one week for the defense expert to be prepared.

{15}    On October 2, 2013, the parties had yet another court conference on the matter, at which point the trial court ordered defense counsel to contact the defense expert and find out the status of his work. It was then determined that trial could resume in two days.

{16}    Ultimately, defense counsel did not call her DNA expert witness to testify at trial. The State's expert, Manogue, testified that the recalculation made the DNA evidence slightly more favorable to Defendant. Defense counsel was able to

thoroughly cross-examine Manogue about the recalculations.

## II. DISCUSSION

{17}    We now address each of Defendant's ten claims of error.

## A. There Was Sufficient Evidence of Deliberate Intent to Support a Rational Jury's Verdict of First-Degree Murder

{18}    Defendant's first argument on appeal is that there was insufficient evidence to establish that he killed Victim deliberately. "Murder in the first degree is the killing of one human being by another without lawful justification or excuse . . . by any kind of willful, deliberate and premeditated killing." Section 30-2-1(A)(1). Requisite deliberation and premeditation for first-degree murder mean that a defendant's conduct must have been "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." *State v. Cunningham*, 2000-NMSC-009, ¶ 25, 128 N.M. 711, 998 P.2d 176 (internal quotation marks omitted) (quoting UJI 14-201 NMRA). Defendant argues that the killing was rash and impulsive and that "there [is] no evidence at all that [he] had deliberated before or during the acts charged."

{19}    Evidence is sufficient to sustain a conviction when there exists substantial evidence of a direct or circumstantial nature "to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v.*

10

*Flores*, 2010-NMSC-002, ¶ 2, 147 N.M. 542, 226 P.3d 641 (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532 (internal quotation marks and citation omitted). "In reviewing whether there was sufficient evidence to support a conviction, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *Id.* (internal quotation marks and citation omitted).

{20}    "Deliberate intent may be inferred from the particular circumstances of killing as proved by the State through the presentation of physical evidence." *State v. Duran*, 2006-NMSC-035, ¶ 8, 140 N.M. 94, 140 P.3d 515. Substantial evidence of deliberation can include "earlier confrontation[s] . . . or other common areas of friction leading to violence," *State v. Tafoya*, 2012-NMSC-030, ¶ 52, 285 P.3d 604, or fleeing the scene, disposing of evidence, or concocting false alibis, *Flores*, 2010-NMSC-002, ¶ 22. This Court has previously determined deliberation in circumstances similar to those presented here. *See, e.g.*, *State v. Rojo*, 1999-NMSC-001, ¶ 24, 126 N.M. 438, 971 P.2d 829 (determining deliberate intent from evidence that the method used to kill the victim took several minutes combined with evidence concerning the

defendant's motive to kill the victim); *State v. Sosa*, 2000-NMSC-036, ¶ 14, 129 N.M. 767, 14 P. 3d 32 (determining that deliberate intent was supported by evidence the defendant entered the victim's home armed, waited for the victim to arrive, shot the unarmed victim numerous times, and pursued the victim as he fled); *State v. Coffin*, 1999-NMSC-038, ¶ 76, 128 N.M. 192, 991 P.2d 477 (determining that deliberate intent to kill was supported by evidence that the defendant ordered the victim to get back in the car and then proceeded to shoot the victim several times from behind); *Cunningham*, 2000-NMSC-009, ¶ 28 (determining that deliberate intent was supported by evidence the defendant fired the fatal shot after the victim was incapacitated and defenseless). In *Duran*, this Court determined that physical evidence of a defendant's prolonged struggle with a victim resulting in multiple stab wounds to the victim's jugular veins and back, combined with evidence of defendant's animus towards the victim and pursuit of her as she tried to escape, was sufficient to support the jury's finding of deliberate intent. *See* 2006-NMSC-035, ¶¶ 8-9. Similarly, in *State v. Guerra*, this Court concluded that evidence of a defendant rendering a victim defenseless and then proceeding to stab that victim thirteen times, conduct referred to by this Court as "overkill," was sufficient to establish deliberate intent. *See* 2012-NMSC-027, ¶ 27, 284 P.3d 1076; *see also Flores*, 2010-NMSC-002,

¶ 22 (determining that a factor supporting deliberate intent was proof the defendant stabbed the victim "so many times that it evidenced an effort at overkill").

{21}     Defendant argues that the controlling authority should be this Court's opinion in *State v. Garcia*, where we concluded that evidence was insufficient to support a rational jury's finding of deliberation. *See* 1992-NMSC-048, ¶ 28, 114 N.M. 269, 837 P.2d 862. Defendant asserts that this was a crime of passion, much like the crime committed in *Garcia*. However, we consider *Garcia* to be factually dissimilar. The defendant in *Garcia* stabbed a victim during a fight. *Id.* ¶ 7. While that fight was the second between the combatants that afternoon, and while the defendant could conceivably have formed a deliberate intent to kill in between the two fights, there was no evidence that such deliberate intent had actually been formed. *See id*. ¶ 30. Unlike *Garcia*, there is sufficient evidence in this case of Defendant's deliberate intent to kill Victim.

{22}     First, here, Defendant had a motive to kill Victim given their past relationship and the threatening confrontation the day before the murder. *Cf. Rojo*, 1999-NMSC-001, ¶ 24 (discussing that evidence concerning defendant's motive for killing and method used to kill provides adequate support of deliberate intent). The cell phone records reveal that Defendant sought out Victim the same morning of the

13

murder. Defendant also disposed of the murder weapon and the jeans he wore during the attack. *Cf. Flores*, 2010-NMSC-002, ¶ 21-23 (discussing post-murder conduct, including disposal of evidence, as being probative of guilt). The attack upon Victim spanned a prolonged period of time, as shown by the forensic evidence and Victim's extensive injuries. *Cf. Duran*, 2006-NMSC-035, ¶ 8 (discussing influence of the extent of a victim's injuries). Last but not least, the fact that Victim suffered no less than ninety stab wounds over her body, including wounds to her back and jugular veins, is compelling evidence of Defendant's deliberate intent to murder Victim. *See id.*

{23} Further, evidence of Defendant's additional actions following the attack reveal deliberation sufficient to support his conviction for first-degree murder. He slashed the tires of the vehicles in Victim's driveway to prevent a rescue or getaway, and he concocted a story to explain his own knife wound. *Cf. Flores*, 2010-NMSC-002, ¶ 22 (discussing post-murder conduct, including use of a false alibi, as being probative of deliberation). In addition, the evidence in the instant case revealed that Defendant did not normally carry a knife, suggesting that Defendant deliberated based on his false alibi for the knife wound, and that he also entered Victim's home after the attack, supporting an inference that he intended to delete evidence from her cell phone. *Id*.

Rather than establishing that the murder occurred during a crime of passion, as in *Garcia*, we hold that the overwhelming evidence in this case is consistent with what we have previously considered in *Tafoya*, *Flores*, and *Duran* to be sufficient to support a rational jury's determination that Defendant acted with deliberate intent to kill Victim. *See Tafoya*, 2012-NMSC-030, ¶ 52; *Flores*, 2010-NMSC-002, ¶ 22; *Duran*, 2006-NMSC-035, ¶ 8; *but see Garcia*, 1992-NMSC-048, ¶ 32.

**B.     Trial Court Did Not Abuse Its Discretion by Allowing the State's Expert to Testify Regarding Recalculations of DNA Results, Even Though They Were Only Disclosed to Defendant the Day Prior to Trial**

{24}     A primary component of the State's case against Defendant for first-degree murder was forensic DNA evidence placing Defendant at the scene of Victim's murder. As mentioned, the State's DNA expert had not recalculated the statistical ratios for four DNA samples until the first day of trial. While the State's DNA expert had initially thought she could testify accurately by referring only to the DNA samples with results that did not need recalculation—i.e., those results that had been timely disclosed—it became apparent during trial that this was untenable. Not knowing the significance of the new DNA statistical ratios, as compared to the pre-recalculation ratios, defense counsel argued that expert consultation and potentially expert testimony at trial was now needed to make sense of those four recalculations.

15

The trial court allowed for defense counsel to effectively respond to the recalculated DNA evidence by granting a week-long continuance of the trial to enable Defendant's expert an opportunity to review the recalculated statistical ratios. Ultimately, despite the short notice and a bit of uncertainty, defense counsel was able to obtain expedited expert consultation and chose not to use any DNA expert's testimony at trial.

{25}    Defendant argues that the late disclosure of the recalculated statistical ratios is in violation of Rule 5-501 NMRA (2007). Rule 5-501 requires the State to disclose its evidence within ten days of arraignment, or as ordered by the court. When the State discovers additional evidence, Rule 5-505(A) requires prompt written notice be provided to a defendant. To enforce Rule 5-505(A) the trial court has a number of remedies at its disposal including granting a continuance, prohibiting a party from introducing the undisclosed material evidence, or entering any other order deemed appropriate. *See* Rule 5-505(B).

{26}    Defendant points to *State v. Allison* for this Court's determination that

> [t]he articles regulating discovery are intended to eliminate unwarranted prejudice which could arise from surprise testimony. Discovery procedures enable the defendant to properly assess the strength of the state's case against him [or her] in order to prepare his [or her] defense. If a defendant is lulled into a misapprehension of the strength of the state's case by the failure to fully disclose, such prejudice may constitute reversible error.

16

2000-NMSC-027, ¶ 9, 129 N.M. 566, 11 P.3d 141 (second and third alterations in original) (internal quotation marks and citation omitted). Defendant argued at trial that the appropriate remedy for the late disclosure was to exclude all DNA evidence—recalculated or not. The trial court disagreed. Instead it chose to delay the trial a week so that defense counsel could address the recalculated DNA results with the guidance of an expert, whom defense counsel might also choose to call to testify at trial.

{27} A trial court's ruling on late discovery is reviewed for an abuse of discretion. *State v. Duarte*, 2007-NMCA-012, ¶ 14, 140 N.M. 930, 149 P.3d 1027. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Moreland*, 2008-NMSC-031, ¶ 9, 144 N.M. 192, 185 P.3d 363 (internal quotation marks and citation omitted). An abuse of discretion is a ruling that is "clearly untenable or not justified by reason." *Id.* (internal quotation marks and citation omitted). If there are reasons both for and against a court's decision, there is no abuse of discretion. *Id.* It is a defendant's burden to establish that the trial court abused its discretion. *State v. Torres*, 1999-NMSC-010, ¶ 10, 127 N.M. 20, 976 P.2d 20. This Court's standard for evaluating the trial court's decision to admit evidence disclosed for the first time at trial considers: "(1) whether

17

the State breached some duty or intentionally deprived the defendant of evidence; (2) whether the improperly non-disclosed evidence was material; (3) whether the non-disclosure of the evidence prejudiced the defendant; and (4) whether the trial court cured the failure to timely disclose the evidence." *State v. Ortega*, 2014-NMSC-017, ¶ 43, 327 P.3d 1076 (citing *State v. Mora*, 1997-NMSC-060, ¶ 43, 124 N.M. 346, 950 P.2d 789 (addressing evidence disclosed for the first time during trial), *abrogation on other grounds recognized by Kersey v. Hatch*, 2010-NMSC-060, ¶ 17, 148 N.M. 381, 237 P.3d 683).

{28} We assume—but do not conclude—that the State breached its obligation under Rule 5-505, and that the recalculated DNA evidence was material evidence. It is undisputed that the recalculated DNA evidence did not prejudice Defendant and in fact was favorable to him. In addition, the trial court cured any adverse consequences due to the untimely disclosure of this evidence by allowing for a reasonable delay in the trial proceedings under Rule 5-505(B).

{29} In support of a finding of prejudice from admission of the recalculated results, despite their favorable impact on Defendant's case, Defendant points to an Eighth Circuit case, *United States v. Davis*, 244 F.3d 666, 671 (8th Cir. 2001), involving a scenario where "[t]he government not only produced the DNA evidence a month late,

but it did so almost literally on the eve of trial, making it virtually impossible, absent a continuance, for defendants to evaluate and confront the evidence against them." In that case, though, the trial court decided to exclude all DNA evidence after finding "that the government acted with reckless disregard of the discovery deadline." *Id.* at 670. The Eighth Circuit held that the trial court did not abuse its discretion, stating "DNA evidence is scientific and highly technical in nature,"and, as a result, that "it would have required thorough investigation by defense counsel, including almost certainly retaining an expert witness or witnesses." *Id.* at 671. Such reasoning is valid but inapplicable here.

{30} First, there is no equivalent "reckless disregard," making the analogy with *Davis* tenuous. Instead, the State missed a listserv email, conduct defense counsel described as prosecutorial negligence rather than recklessness. In the instant case, the recalculated DNA data was provided to Defendant the same day the report was made, Defendant was allowed to have expedited expert review of the data, and defense counsel had the opportunity to thoroughly cross-examine the State's DNA expert at trial after consulting with her own expert.

{31} Second, the effect of the recalculation was seemingly in favor of Defendant. The only difference postrecalculation was that some of the results had the

19

probabilities of a mistaken match to Defendant's DNA changed from one-in-billions to one-in-millions. Defendant now argues that had he been aware of the higher statistical probability that there was a mistaken match, plea negotiations may have taken a different course, despite the fact that only four of the recalculations exhibited the increased probability. Understandably, the recalculations did not change the State's view of the strength of its case.

{32}     We also note that "when a party has acted with a high degree of culpability, the severe sanctions of dismissal or the exclusion of key witnesses are only proper where the opposing party suffered tangible prejudice." *State v. Harper*, 2011-NMSC-044, ¶¶ 19-20, 150 N.M. 745, 266 P.3d 25. Defendant does not make a plausible showing of prejudice by the delay, particularly where defense counsel was given the recalculated DNA results on the same day as the State. *See id.*

{33}     Finally, the trial court appropriately cured the consequences of the untimely disclosure. When the trial court realized that there was no way around introducing the recalculated DNA results, it continued the trial proceedings for one week—just enough time to enable defense counsel to consult a DNA expert. Given that the defense expert's statements in an affidavit raised no concerns about short notice and expediting his review, and given that there was no prejudice to Defendant by

admitting the recalculated DNA results, the trial court's decision to admit the evidence was justified. We therefore conclude that the trial court did not abuse its discretion in admitting the recalculated results at trial.

**C.    Trial Court Did Not Abuse Its Discretion by Communicating With the Expert That It Ordered Defense Counsel Obtain Midtrial**

{34}    The obvious confusion and uncertainty as to whether defense counsel would need to retain a DNA expert for trial was reasonable, given the late disclosure of the recalculated DNA evidence and the last minute change of the State's DNA expert's testimony. Defense counsel ultimately secured a DNA expert. By telephone outside the jury's presence, the trial court directly requested the expert to expedite his review of the evidence to minimize delay in the trial proceedings and emphasized the importance of the trial by mentioning that Victim suffered ninety stab wounds.

{35}    Defendant takes issue with the trial court's intervention in this regard as well as its repeated requests for updates on the expert's review. The trial court ultimately denied Defendant's motion to declare a mistrial based upon the aforementioned intervention.

{36}    Defendant now argues on appeal that the trial court committed reversible error in denying his motion for a mistrial, and that the conduct of the trial court unconstitutionally deprived him of effective assistance of counsel. Defendant points

to case law from California holding that effective assistance of counsel includes the assistance of experts in preparing a defense in a confidential manner. *See Prince v. Superior Court*, 10 Cal. Rptr. 2d 855, 857 (Ct. App. 1992).

{37} The cases upon which Defendant relies are distinguishable and thus inapplicable to the facts before us. In *Prince*, at issue were a limited quantity of samples for DNA testing. *Id.* The trial court in *Prince* ordered that the defendant and prosecution could each have half of the samples to test, and that each party could observe the other's tests of the physical DNA samples and have access to those results. *Id.* The appellate court determined that the defendant's inability to independently and confidentially test and review the DNA results was essentially court-ordered ineffective assistance of counsel, and issued an extraordinary writ reversing the trial court order. *Id.* The other case upon which Defendant relies involved court ordering of public funding of expert assistance to achieve effective assistance of counsel for an indigent defendant. *Corenevsky v. Superior Court*, 682 P.2d 360, 366-67 (Cal. 1984) (en banc). Because the facts in both of these California cases are distinguishable from the instant case their logic does not support Defendant's argument. *See also Smith v. Halliburton Co.*, 1994-NMCA-055, ¶ 14, 118 N.M. 179, 879 P.2d 1198 ("[W]e are not bound by the law of other

jurisdictions."). Defendant's argument that the trial court's interference in the timing of his expert's analysis during the trial deprived him of effective assistance of counsel is without merit. The trial court in this case, unlike in *Prince*, had no influence on the analysis of physical DNA samples and, unlike in *Corenevsky*, had no influence on Defendant's own access to the assistance of his expert .

{38}   We now turn to Defendant's alternative grounds for challenging the trial court's denial of his motion for a mistrial arising from its attempt to expedite the DNA expert's analysis during trial. Again, we review the trial court's conduct for abuse of discretion. *See State v. Gallegos*, 2009-NMSC-017, ¶ 21, 146 N.M. 88, 206 P.3d 993; *State v. Saavedra*, 1985-NMSC-077, ¶ 11, 103 N.M. 282, 705 P.2d 1133, *abrogated on other grounds by State v. Bellanger*, 2009-NMSC-025, 146 N.M. 357, 210 P.3d 783. Contrary to Defendant's assertions, the trial court did not order defense counsel to not speak privately with the expert. Here, the trial court urged defense counsel to timely consult and retain an expert. The trial court played no part in the substance or process of the expert's analysis. Instead, being understandably concerned about the timeliness of the analysis, the trial court properly inquired as to what documentation the expert might require from the State in order to complete his analysis as promptly as possible. *See Belser v. O'Cleireachain*, 2005-NMCA-073, ¶

23

3, 137 N.M. 623, 114 P.3d 303 (discussing the inherent authority of the trial court to efficiently manage trial proceedings). The efforts on the part of the trial court to facilitate Defendant's assessment of the recalculated DNA results through expert review were entirely appropriate under the circumstances.

{39} In summary, the trial court's communication with the expert witness was simply procedural and not substantive, designed to assure compliance with quick deadlines so the trial could resume as soon as possible, and it did not unduly interfere with Defendant's right to have independent and confidential expert services. The trial court's decision to actively ensure Defendant's prompt—and private—consultation with an expert was justified by reason and was not contrary to any relevant New Mexico law. In its exercise of discretion, the trial court's actions were not "obviously erroneous, arbitrary, or unwarranted" or "clearly against the logic and effect of the facts and circumstances before [it]." *State v. Alberico*, 1993-NMSC-047, ¶ 63, 116 N.M. 156, 861 P.2d 192. We conclude that the trial court's conduct was not an abuse of discretion. *See Gallegos*, 2009-NMSC-017, ¶ 21; *Saavedra*, 1985-NMSC-077, ¶ 11.

**D. Trial Court Did Not Err in Admitting Either the Testimony of the Supervising Pathologist or the Autopsy Photographs**

{40} Defendant next argues that the pathologist testimony of Dr. Clarissa Krinsky

violated his Sixth Amendment right "to be confronted with the witnesses against him," U.S. Const. amend. VI, because Dr. Krinsky had not personally performed Victim's autopsy. We review Confrontation Clause issues de novo. *State v. Lasner*, 2000-NMSC-038, ¶ 24, 129 N.M. 806, 14 P.3d 1282.

{41}    Dr. Krinsky, a forensic pathologist and medical investigator for the New Mexico Office of the Medical Investigator was qualified to testify in this case as an expert in forensic pathology. Defendant takes issue with the fact that she testified but only supervised and oversaw a trainee pathologist in the execution of the autopsy. Both Dr. Krinsky and the trainee participated in generating the autopsy report, and both signed the report. Dr. Krinsky had final responsibility for the content of the report as she confirmed all statements originally drafted by the trainee and made significant changes to the report as needed. Thus, testimony in connection to the autopsy report, including the opinions she rendered, was her own, was made under oath, and was subject to cross-examination.

{42}    Under the Confrontation Clause, U.S. Const. amend. VI, "an out-of-court statement that is both testimonial and offered to prove the truth of the matter asserted may not be admitted unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant." *State v. Navarette*, 2013-NMSC-003, ¶

25

7, 294 P.3d 435. The United States Supreme Court held in *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011), that "[a] document created solely for an evidentiary purpose, . . . made in aid of a police investigation, ranks as testimonial." *Id*. at 2717 (internal quotation marks and citation omitted). Consequently, an expert could not testify based on the contents of someone else's autopsy report, though "an expert witness may express an independent opinion regarding his or her interpretation of raw data without offending the Confrontation Clause." *Navarette*, 2013-NMSC-003, ¶ 22. That is not the case here. Instead, in reviewing the trial testimony of Dr. Krinsky, the autopsy report—that was prepared in her office under her direction and supervision, and was reviewed, altered, and approved in accordance with her professional judgment—was the product of her own independent participation in the autopsy.

{43}     This Court has previously held that under these circumstances a supervising pathologist may properly offer autopsy testimony without violating the Confrontation Clause. *See State v. Cabezuela*, 2011-NMSC-041, ¶ 52, 150 N.M. 654, 265 P.3d 705 ("[T]he record before us supports a reasonable inference that [the expert] had personal knowledge of and participated in making the autopsy report findings by virtue of her own independent participation in the microscopic exam, examination of the body and the injuries, and examination of all the photographs. Therefore, the

26

record supports a conclusion that [the expert] had sufficient personal knowledge to testify as to what [the other expert] discovered through the autopsy."). Other jurisdictions agree that a supervisor in the role of Dr. Krinsky is sufficiently involved in the generation of an autopsy report to call it one's own. *See Marshall v. Colorado*, 2013 CO 51, ¶ 18, 309 P.3d 943, reh'g denied (Sept. 9, 2013), *cert. denied sub nom. Marshall v. Colorado*, 134 S. Ct. 2661 (2014) (distinguishing *Bullcoming*, where testifying witness had no connection with a particular laboratory report, in a scenario where the testifying witness had supervised the performance of tests, reviewed the analysts' work, and certified the laboratory report). We conclude that Defendant was not deprived of his right to confront and meaningfully cross-examine the author of Victim's autopsy report.

{44} Defendant also argues that autopsy photographs were testimonial and therefore should not have been admitted because "[a] document created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial." *Bullcoming*, 131 S. Ct. at 2717 (internal quotation marks and citation omitted). But not all "material contained within an autopsy file is testimonial." *Navarette*, 2013-NMSC-003, ¶ 22 (using photographs contained in an autopsy file as an example of materials on which an expert may provide opinion testimony independent of having

"performed the autopsy and t[aken] the photographs"). It is well settled in other jurisdictions that photographs are not generally testimonial statements. *See United States v. Beach*, 196 Fed. Appx. 205, 209 (4th Cir. Aug. 30, 2006) (unpublished) (per curiam) ("[The defendant] has failed to demonstrate how photographs of seized evidence could conceivably constitute the 'testimonial' statements that [federal precedent] bars."); *People v. Cooper*, 56 Cal. Rptr. 3d 6, 17 (Ct. App. 2007) ("Photographs and videotapes are demonstrative evidence, depicting what the camera sees. . . . They are not testimonial and they are not hearsay." (citations omitted)); *Watson v. State*, 421 S.W.3d 186, 195-98 (Tex. Crim. App. 2013) ("[T]he silent videotaped recording in question was neither testimonial nor a statement and, therefore, did not invoke the Sixth Amendment."). We agree that an autopsy photograph depicting a murder victim's wounds does not depict a person making an oral or written assertion or performing nonverbal conduct intended as an assertion. *See* Rule 11-801(A) NMRA (" 'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."). As such, photographs of this nature are not statements and are thereby not hearsay that could violate the Confrontation Clause. We hold that autopsy photographs of this nature do not constitute testimonial statements and therefore do not invoke the Sixth

28

Amendment. In addition, the author of the report containing the autopsy photographs—Dr. Krinsky—was available for Defendant to confront through cross-examination. Therefore, the trial court's admission of Dr. Krinsky's testimony and the autopsy photographs did not violate Defendant's Sixth Amendment right to confront this evidence against him.

**E.     The State Did Not Elicit Prejudicial Bad-Acts Evidence**

{45}     We next address Defendant's argument that the trial court erred by admitting bad-acts evidence—with respect to prior domestic violence between Defendant and Victim—despite an order in limine excluding such evidence. The State had agreed before trial that it would not present evidence of the previous domestic violence incidents between Defendant and Victim. Yet, at trial, the detective who investigated the murder and apprehended Defendant, Detective Landavazo, testified that he spoke with Victim's mother, and she "relayed . . . that there was an incident." The State also asked if the detective had followed up on any leads regarding Defendant, and he replied that Victim's mother had told him "there was a report initiated." The prosecutor said she was uninterested in a report. She only wanted the detective to explain how he located Defendant, to which the detective responded he had printed out a "picture of the only Dorall Smith there is in our system." Defense counsel

29

objected as this was exactly the subject of the motion in limine. The trial court was "concerned about Detective Landavazo's testimony," however, defense counsel ultimately rejected a curative instruction because it would draw attention to the matter. The trial court then denied defense counsel's motion for mistrial on this issue.

{46} Rule 11-404(B)(1) NMRA precludes the admission of evidence of a person's character "to prove that on a particular occasion the person acted in accordance with the character," known as bad-acts evidence. An error committed by admitting inadmissible evidence is generally cured by a ruling of the court striking the evidence and admonishing the jury to disregard such evidence. *State v. Simonson*, 1983-NMSC-075, ¶¶ 19-21, 100 N.M. 297, 669 P.2d 1092. "An evidentiary ruling within the discretion of the court will constitute reversible error only upon a showing of an abuse of discretion and a demonstration that the error was prejudicial rather than harmless." *State v. Jett*, 1991-NMSC-011, ¶ 8, 111 N.M. 309, 805 P.2d 78 (citation omitted).

{47} The content of the detective's testimony concerned how he came to apprehend Defendant, and the prosecutor attempted to steer him away from any reference to the prior domestic violence incident. Here, the potential extrapolation from the detective's testimony to a juror's inference of guilt by propensity was judged

30

harmless even by the defense counsel—hence her decision not to request a curative instruction. Defense counsel considered that the slight chance the jury would assume domestic violence was not worth the risk of drawing their attention to it by having a curative instruction given. Thus, any potential error was harmless. Accordingly, we conclude that the trial court did not abuse its discretion in choosing to deny Defendant's motion for a mistrial based on the detective's testimony.

{48} Additionally, during closing argument, the prosecutor said "we also know that [Victim] was sending mixed messages, and in a domestic violence relationship, sometimes that happens," to which defense counsel objected. The trial court overruled the objection. We interpret the prosecutor's comments as a reference to Defendant's instant attack killing Victim, rather than the alleged domestic violence incident happening months before. In context, the prosecutor first told the jury: "The manner of the crime, 90 stab wounds was someone that wanted it to be painful for her. It wasn't stranger violence. It was domestic violence." The prosecutor then discussed the afternoon prior to Victim's death, when Defendant threatened her, and characterized their relationship as one of domestic violence. As opposed to a propensity or bad-acts reference, it more likely was a reference to the failed nature of the relationship between Victim and Defendant—a relationship that was a key aspect

31

of the facts surrounding the murder—in support of the State's theory that it was a deliberate act. Further, the reference could have been to the instant murder by the fact that Defendant's attack upon Victim, despite whatever relationship they once had, could now be considered a relationship of domestic violence.

{49} We therefore conclude that there was no prejudicial abuse of discretion. Defendant was neither prejudiced by the prosecutor's characterization of the facts in closing argument, nor did the trial court abuse its discretion in overruling the objection. We hold that there was no error in admitting the evidence Defendant considers impermissible bad-acts evidence.

**F.     Trial Court Did Not Abuse its Discretion in Denying Motion for Mistrial Based on Improper Joinder**

{50} Defendant next takes issue with the trial court's denial of his mistrial motion based on joinder of the charges against him for first-degree murder and criminal damage to property. We review the trial court's denial of the motion for mistrial for abuse of discretion, *see Gallegos*, 2009-NMSC-017, ¶ 21, and conclude there was no abuse of discretion because joinder was both proper and mandatory.

{51} Defendant argues first that "one test for abuse of discretion [for improper joinder] is whether prejudicial testimony, inadmissible in a separate trial, is admitted at a joint trial." *State v. Jones*, 1995-NMCA-073, ¶ 3, 120 N.M. 185, 899 P.2d 1139.

32

"Thus the question is whether the evidence of each episode would be admissible in a trial of the other." *Id*. Here, the specific question is whether evidence of Defendant's slashing of tires of vehicles in Victim's driveway—the basis for the charge of criminal damage to property—would be admissible in his murder trial, and vice versa in a criminal damage to property trial. According to Defendant, evidence that Defendant slashed the tires, despite the blood on the tires coming from both Victim and Defendant, was unrelated to the murder and thus inadmissible bad-acts evidence, meaning the two cases should never have been joined.

{52} The New Mexico rules of criminal procedure require that similar offenses must be joined in one prosecution and not be brought piecemeal by way of sequential trials. *See State v. Gonzales*, 2013-NMSC-016, ¶ 25, 301 P.3d 380. Rule 5-203(A) states:

> Two or more offenses shall be joined in one complaint, indictment or information with each offense stated in a separate count, if the offenses, whether felonies or misdemeanors or both:
>
> (1)  are of the same or similar character, even if not part of a single scheme or plan; or
> (2)  are based on the same conduct or on a series of acts either connected together or constituting parts of a single scheme or plan.

{53} The joinder rule is met on these facts. What has been joined, though, could still be severed if a defendant would be prejudiced by testimony with respect to one

33

charge that would otherwise be inadmissible absent the joinder. Rule 5-203(C). And, as Defendant essentially argues, "[a] defendant might [actually] be prejudiced if joinder of offenses permit[s] the jury to hear testimony that would have been otherwise inadmissible in separate trials." *State v. Jacobs*, 2000-NMSC-026, ¶ 15, 129 N.M. 448, 10 P.3d 127. "Even when the trial court abuses its discretion in failing to sever charges, appellate courts will not reverse unless the error actually prejudiced the defendant." *State v. Gallegos*, 2007-NMSC-007, ¶ 18, 141 N.M. 185, 152 P.3d 828.

{54} Here, joinder was mandatory and Defendant was not thereby prejudiced. The State argued that Defendant stabbed Victim and then slashed the tires on the vehicles in her driveway. These were a connected series of acts. There was no evidence or argument that a different person might have slashed the tires, or that these incidents occurred at different dates or in different places. These acts were part of the same plan or scheme: Defendant stabbed Victim and disabled her most immediate means of escape transportation. The criminal damage evidence, that the tires were slashed, would have been cross-admissible in a trial solely on the question of first-degree murder because it was evidence of deliberation: a purely passionate, impulsive attacker would not ordinarily methodically slash nearly every tire on the nearby

34

vehicles. The tire slashing evidence explained Defendant's blood spatters on or near the vehicles, which helped to place Defendant at the scene of the murder and show the intermingling of his and Victim's blood. As well, in a separate trial for criminal damage, the evidence of the homicide is evidence of Defendant's motive for slashing the tires. The stabbing evidence is also necessary background for why Defendant's and Victim's DNA were mingled in blood spatter on or near the vehicles, crucial evidence placing Defendant at the scene of the criminal damage.

{55}     The homicide evidence is crucial to understanding both the crime scene and explaining the activities of police, while the criminal damage evidence is crucial to demonstrating deliberation. Since the evidence in either case would be cross-admissible, we conclude that the evidence did not prejudice Defendant and the trial court did not abuse its discretion by refusing to sever the two cases under Rule 5-203(C).

**G.     Defendant's Right to a Speedy Trial Was Not Violated**

{56}     Defendant next argues that the three-year delay, from indictment to trial, violated his constitutional right to a speedy trial. Defendant was indicted on September 21, 2010. Defendant was tried on September 17, 2013, approximately three years after his indictment. The State and Defendant agree that there were

35

continuances granted to them jointly from July 5, 2011, to October 24, 2011, and from April 30, 2012, to June 25, 2012, approximately five months. Defense counsel received a continuance from January 9, 2012, until April 30, 2012, approximately four months. Then, in mid-June, defense counsel received another continuance of approximately one month, until July 23, 2012. The case was also stayed pending a competency determination from July 23, 2012, to March 18, 2013, approximately eight months. Trial was eventually set for September 16, 2013. Out of the thirty-six total months of delay, approximately seventeen were Defendant-caused or neutral, and eighteen were caused by the State. Defendant argues only eight months were Defendant-caused or neutral, and the State argues it was twenty-two months. Regardless of the difference in the length of delay the sides argue is Defendant-caused or neutral, we conclude there was no prejudice to Defendant resulting from the delay attributable to the State, which our review of the record shows was approximately eighteen months. Thus, Defendant cannot prevail on his speedy trial claim. We explain.

{57}     Defendant initially raised the speedy trial claim pro se after the trial was continued to allow for a competency evaluation. Though, defense counsel did not ultimately raise a speedy trial violation claim at trial because, other than the time for

36

determination of competency, the delay of approximately two years was "fairly standard among these kinds of cases." This issue is thus raised on appeal as a fundamental error. *See* Rule 12-216(B)(2) NMRA (providing appellate court discretion, as an exception to the preservation rule, to review questions involving fundamental error).

{58} In determining whether a defendant's speedy trial right was violated, this Court has adopted the United States Supreme Court's balancing test in *Barker v. Wingo*, 407 U.S. 514 (1972). *State v. Garza*, 2009-NMSC-038, ¶¶ 9, 13, 146 N.M. 499, 212 P.3d 387. Under the *Barker* framework, courts weigh "the conduct of both the prosecution and the defendant" under the guidance of four factors: (1) the length of the delay; (2) the reasons for the delay; (3) the timeliness and manner in which the defendant asserted his speedy trial right; and (4) the particular prejudice that the defendant actually suffered. *Garza*, 2009-NMSC-038, ¶¶ 13, 32, 35 (internal quotation marks and citation omitted). "Each of these factors is weighed either in favor of or against the State or the defendant, and then balanced to determine if a defendant's right to a speedy trial was violated." *State v. Spearman*, 2012-NMSC- 023, ¶ 17, 283 P.3d 272.

{59} Relying on *Garza*, Defendant argues that the delay in this case of "intermediate complexity" is "presumptively prejudicial." *See* 2009-NMSC-038, ¶¶ 2, 48

(establishing that a trial delay of fifteen months or more "may be presumptively prejudicial," triggering a speedy trial inquiry in a case of intermediate complexity). *Garza*, though, "abolish[ed] the presumption that a defendant's right to a speedy trial has been violated based solely on the threshold determination that the length of delay is 'presumptively prejudicial.'" *Id.* ¶ 21. Instead, Defendant must still show particularized prejudice cognizable under his constitutional right to a speedy trial and demonstrate that, on the whole, the *Barker* factors weigh in his favor. *See Garza*, 2009-NMSC-038, ¶ 21. Here, the scale of that balance weighs in favor of the State because there was no actual prejudice from the delay incurred to address concerns of the defense about the recalculations of some of the DNA statistical probabilities.

{60} As stated, the prejudice factor weighs heavily against Defendant and is outcome determinative. We analyze prejudice to a defendant in a speedy trial case in light of three defense interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* ¶ 35. The third interest addresses the most serious type of prejudice, impairment of the defense. *Barker*, 407 U.S. at 532. In this case, Defendant's case was strengthened by the delay. New methods of DNA statistical analyses were implemented that increased the statistical probability that the DNA

match to Defendant was mistaken for four of the samples. We conclude that the delay in this case, approximately half of which was attributable to neutral causes or to Defendant for the benefit of his case, was not unconstitutionally prejudicial to Defendant.

**H.    Defense Counsel Was Not Ineffective**

{61}    Defendant next argues that defense counsel should have argued the aforementioned speedy trial violation with more vigor and obtained a DNA expert prior to trial, and thus counsel's failure to so do constitutes ineffective assistance.

{62}    In order to establish a successful claim of ineffective assistance of counsel, a defendant is required to "first demonstrate error on the part of counsel, and then show that the error resulted in prejudice." *State v. Bernal*, 2006-NMSC-050, ¶ 32, 140 N.M. 644, 146 P.3d 289. A prima facie case of ineffective assistance of counsel is made on appeal where: "(1) it appears from the record that counsel acted unreasonably; (2) the appellate court cannot think of a plausible, rational strategy or tactic to explain counsel's conduct; and (3) the actions of counsel are prejudicial." *State v. Herrera*, 2001-NMCA-073, ¶ 36, 131 N.M. 22, 33 P.3d 22 (internal quotation marks and citation omitted); *see also Bernal*, 2006-NMSC-050, ¶ 32. "[A] prima facie case is not made when a plausible, rational strategy or tactic can explain the conduct of defense

39

counsel." *State v. Richardson*, 1992-NMCA-112, ¶ 12, 114 N.M. 725, 845 P.2d 819, *abrogated on other grounds by Allen v. LeMaster*, 2012-NMSC-001, 267 P.3d 806.

{63}    Defendant filed a pro se speedy trial motion, but defense counsel chose not to argue such a motion because she considered the delay to be "fairly standard among these kinds of cases." Given the lack of prejudicial delay, and the potential benefit to Defendant from the recalculations that caused the delay, defense counsel cannot be said to have acted unreasonably in determining that a speedy trial motion was inappropriate at this point.

{64}    Regarding failure to obtain an expert before trial, the record reveals that defense counsel believed that the State's expert would not testify as to the recalculated results since the other DNA results would have been sufficient to make the State's case. This did not happen, but it was by no fault of defense counsel. Defense counsel's decision not to seek a DNA expert prior to trial was reasonable based on her estimation that the State's expert would only testify to the results of the original DNA evidence calculations. Further, Defendant was not prejudiced because defense counsel ultimately obtained an expert midtrial when it became clear the State's expert would testify about the recalculation results. At this time, we are not persuaded by Defendant's arguments that his defense counsel was ineffective, but we

allow that claim to be further developed in postappeal habeas corpus proceedings.

**I.      Trial Court Did Not Abuse its Discretion in Denying Defendant's Multiple Motions for Mistrial**

{65}    Over the course of the trial, Defendant alleged numerous errors on the part of the trial court by filing two motions for a mistrial, and then a renewed motion for mistrial after the original two motions were denied. We have specifically addressed some of the merits of those motions in subsections B, C, D, and F of this opinion. We distill that there remain three additional issues raised in Defendant's motions for mistrial, and conclude that they are likewise without merit because they do not constitute an abuse of discretion by the trial court. Regarding the wholesale denial of his mistrial motions, Defendant generally argues on appeal on three grounds: (1) "[t]he trial court's failure to grant a mistrial . . . [when] the trial had reached a point where it was 'out of control' . . . [because] the prosecutor was making comments about defense counsel," (2) "the trial court ha[ving] recessed the jury for a lengthy time," and (3) judicial impropriety by failure of the trial court to maintain decorum. We proceed to address each of these additional claims of error.

{66}    A brief recitation of the relevant facts is necessary for thorough review. On September 23, 2013, defense counsel filed a motion for mistrial and for barring retrial of Defendant. The motion alleged facts regarding a joinder issue and facts regarding

a Confrontation Clause issue, both of which we previously addressed. The same day, defense counsel filed a motion to strike "comments and conduct by the [p]rosecutor which improperly influence the jury and shift the burden of proof against the Defendant." The motion listed a number of comments made by the prosecutor, including the comment to a witness, after he was unable to identify Defendant: "But he is a Black man?" As well, it listed several other comments, including a detective's statement that he knew of Defendant's prior relationship with Victim by reference to the police database.

{67}     On September 24, 2013, defense counsel filed a second motion for mistrial and for barring retrial of Defendant. The new motion involved the DNA recalculations addressed in subsections B and C of this opinion. The motion argued that dismissal of the case or exclusion of the DNA evidence was the appropriate remedy for those alleged errors. It also urged the trial court to admonish the prosecutor "regarding her asides and unprofessional comments." In arguing her mistrial motions to the trial court, defense counsel noted that the State had failed to provide to her a PowerPoint it had used for direct examination of a witness when she cross-examined the same witness, forcing her to use the photographs contained in the slides. Next, defense counsel raised the issue of prosecutorial misconduct, giving examples: (1) the

prosecutor told the court that there are five attorneys in the courthouse "who are very difficult and hard to get along with" and said that defense counsel was one of those attorneys; (2) the prosecutor, after defense counsel objected and a discussion was held at the bench, went back to the podium and said, "Now, before she interrupted you"; (3) the prosecutor made use of Defendant being African American to try to assist a witness in identifying Defendant; (4) the prosecutor made improper use of refreshing witnesses' memories; (5) the prosecutor elicited bad-acts evidence that had been the subject of a motion in limine, addressed in subsection F of this opinion; and (6) the prosecutor failed to inform defense counsel of last-minute witness changes. Defense counsel also referenced the trial court's alleged interference with the DNA expert and raised the duration of the jury recess, stating that the New Mexico Constitution's assurance of the right to a fair and impartial jury is compromised by the delay. Defense counsel then cited Rule 21-300(B)(3) NMRA (2009), arguing that the trial so far—based on the aforementioned facts—had been "out of control," despite the requirement that the judge maintain order and decorum.

{68}	Ultimately, defense counsel filed a renewed motion for mistrial and demand for recusal. The motion reiterated prior arguments and noted that the trial court had expressed 'open irritation' with defense counsel and involved itself with defense

43

witnesses, intimating judicial impropriety and bias. The trial court denied each defense motion.

{69} "A motion for a mistrial is addressed to the sound discretion of the trial court and is only reviewable for an abuse of discretion." *Saavedra*, 1985-NMSC- 077, ¶ 11. "[T]he power to declare a mistrial should be exercised with the greatest caution." *State v. Sutphin*, 1988-NMSC-031, ¶ 18, 107 N.M. 126, 753 P.2d 1314. An argument for mistrial must show that the error committed constituted legal error, and the error was so substantial as to require a new trial. *See State v. Ferguson*, 1990-NMCA-117, ¶ 4, 111 N.M. 191, 803 P.2d 676 (stating that legal error requiring a new trial must be "substantial enough to warrant the exercise of the trial court's discretion"). We hold that the trial court did not err in denying these motions for the reasons that follow.

{70} Taking the facts surrounding these motions cumulatively, we distill Defendant's residual arguments to be premised on alleged trial court error by allowing the trial to grow out of control, primarily due to prosecutorial misconduct and lengthy delay, thereby resulting in an atmosphere of judicial impropriety. Defendant argues that the trial grew so out of control that the trial court erred in denying his motions, *see State v. Vallejos*, 1974-NMCA-009, ¶ 26, 86 N.M. 39, 519

44

P.2d 135 (determining that the cumulative impact of a prosecutor's improper comments was so prejudicial that it deprived the defendants of a fair trial). The facts of this case do not reflect the level of prosecutorial misconduct in *Vallejos*, where (1) one defendant charged with battery on a police officer had no weapon, but a codefendant charged with aggravated assault on a police officer allegedly used a straight razor, and the prosecution displayed a butcher knife that could not be connected to either defendant; (2) the district attorney referred to an irrelevant shooting of a United States Senator to raise a conspiracy theory; and (3) the prosecutor in effect told the jury that defendants were guilty or he would not have brought them to trial. 1974-NMCA-009, ¶¶ 1, 8-17, 24. There, the cumulative impact was so prejudicial it deprived defendants of a fair trial. *Id.*

{71}     Here, the trial court appropriately managed the trial and minimized the impact of a midtrial delay that was needed to benefit the defense. When viewing the three residual events Defendant urges this Court to deem as cumulative error under *Vallejos*—the prosecutor's comments about the defense counsel, the trial court recess, and the alleged overall judicial impropriety—we cannot come to the same conclusions as Defendant. Considering all the matters raised by Defendant in his motions for mistrial, the trial court's denial of said motions does not constitute an

abuse of discretion. The prosecutor's comments that the defense counsel was difficult and hard to work with are, at most, unprofessional comments. And, where motions for mistrial are filed by Defendant on the basis of a trial recess granted for the sole purpose of benefitting Defendant, there can be no error. The recess lasted only ten days, and it was properly within the scope of the trial court's "inherent authority to control and manage [trial] proceedings and preserve the integrity of the trial process." *State v. Wyrostek*, 1994-NMSC-042, ¶ 19, 117 N.M. 514, 873 P.2d 260 (alteration in original) (internal quotation marks and citation omitted). It follows that, even when taken cumulatively, Defendant's allegations fall well short of the conduct demanding mistrial in *Vallejos.* We conclude that the trial court properly denied Defendant's numerous motions for mistrial and did not abuse its discretion in doing so.

**J.      Defendant Did Not Suffer Cumulative Error Requiring Reversal**

{72}      Finally, since the trial court's denials of Defendant's motions for mistrial were made within its sound discretion, sufficient evidence exists for a jury's finding of first-degree murder, Defendant was able to confront all evidence against him, trial delay did not constitute a speedy trial violation, and defense counsel was not ineffective on this record, there is no cumulative error requiring reversal under *State v. Roybal*, 2002-NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61 ("The doctrine of

46

cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial.").

**III.    CONCLUSION**

{73}    For the foregoing reasons, we affirm Defendant's convictions.

{74}    **IT IS SO ORDERED.**

 

_____
**BARBARA J. VIGIL, Chief Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**

**JUDITH K. NAKAMURA, Justice, not participating**